# United States Court of Appeals

## For the Eighth Circuit

_____

No. 18-1506

_____

United States of America

*Plaintiff - Appellee*

v.

Chase Logan Guzman

*Defendant - Appellant*

_____

No. 18-2202

_____

United States of America

*Plaintiff - Appellee*

v.

Justin Thomas Morales, also known as Speedy

*Defendant - Appellant*

_____

Appeals from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: February 13, 2019
Filed: June 13, 2019

_____

Before LOKEN, COLLOTON, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

As part of an investigation of large-scale methamphetamine trafficking, law enforcement officers pulled over Justin Morales and Chase Guzman in a traffic stop and found a pound of marijuana and a firearm on Guzman. Officers obtained a search warrant and subsequently found more marijuana and two pounds of methamphetamine inside a home connected to the trafficking. Morales and Guzman were indicted on one count of conspiracy to distribute methamphetamine, and Guzman was indicted on one count of using or carrying a firearm during and in relation to a drug trafficking crime. After the district court[1] denied their respective motions to suppress evidence, Guzman conditionally pleaded guilty to both counts and Morales proceeded to trial where the jury found him guilty. Defendants separately appeal the district court's denial of their motions to suppress and raise various sentencing and evidentiary issues. We consolidated the appeals, and for the reasons explained below, we affirm.

I

At the suppression hearing, various law enforcement officers testified to the following facts. In March 2016, a confidential informant (CI) told agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) that Morales would be trafficking firearms and large quantities of methamphetamine from Wichita, Kansas,

_____

[1] The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

to Sioux Falls, South Dakota, and the surrounding area. According to the CI, Morales asked him to help with the transportation and local distribution of the drugs. ATF Special Agents Emmet Warkenthien and Brent Fair opened an investigation.

Over the next several months, ATF agents amassed evidence of Morales's methamphetamine trafficking. The agents recorded more than forty phone calls between the CI and Morales discussing methamphetamine "buys." Some of these purchases came to fruition. In April 2016, for instance, ATF agents arranged for the CI to conduct a controlled buy of approximately four ounces of methamphetamine from Morales in exchange for $5,000.

In the early morning hours of September 22, 2016, the CI contacted Warkenthien with information that would lead to Morales's and Guzman's arrests later that day. The CI told Warkenthien that Morales and Guzman had arrived in Sioux Falls from Witchita to sell methamphetamine and marijuana. The CI relayed that Morales and Guzman were staying at the Days Inn hotel in Sioux Falls and that the CI planned to meet with Morales that morning to discuss the CI's involvement in the drug trafficking. Fair drove to the Days Inn to set up surveillance.

As anticipated, the CI spent a large part of the morning meeting with Morales and Guzman at the Days Inn and some area businesses. The CI recorded many of the group's conversations. In one of these conversations, Morales told the CI that he was storing two pounds of methamphetamine and three pounds of marijuana at the home of Jerri Young Running Crane in Sioux Falls. Morales also told the CI that he had a 9mm Glock 19 semiautomatic pistol that Guzman intended to "take with him" for "protection" during drug sales.

While stationed at the Days Inn parking lot that morning, Fair observed two people get out of a Kansas-plated minivan registered to Jacqueline Morales and get into the CI's vehicle. Fair personally identified one of the individuals as Justin

Morales based on photos that he had seen previously. Other agents also stationed at the hotel identified the other individual as Guzman and communicated that information via radio to the rest of the investigation team. Morales, Guzman, and the CI left the Days Inn parking lot but returned sometime later, still in the CI's vehicle. All three individuals exited the CI's vehicle and accessed a Kansas-plated pickup truck registered to Guzman. Agents then saw Morales and Guzman get into the minivan and drive off.

Guzman and Morales drove to Young Running Crane's home, where agents had also set up surveillance. An agent positively identified Morales and Guzman getting out of the minivan and entering the home. Some time later, Sioux Falls Narcotics Detective Adam Buiter observed Morales and Guzman—both of whom he identified based on pictures he had previously seen—exit the home and get into the minivan once more. Buiter relayed this information to the rest of the investigation team.

The minivan left Young Running Crane's home, and several members of the surveillance team followed in unmarked cars. The minivan's "circuitous" driving around area businesses made the agents concerned that their surveillance had been, or soon would be, detected. So they decided to enlist the assistance of the South Dakota Highway Patrol to conduct a "ruse" stop of the vehicle in a marked patrol car based on the evidence of drugs and firearms they had already collected that day. The intent of such a stop is to maintain the appearance of an everyday traffic stop so as to not alert subjects of a narcotics investigation that they may soon be arrested, and to minimize dangers that may arise when armed suspects are stopped by unmarked law enforcement vehicles.

Detective Dan Christiansen, who was part of the surveillance team, contacted State Trooper Andrew Steen to assist with the stop. Christiansen told Steen that the minivan's occupants possessed drugs and firearms. Steen was instructed that he did

not have wait to develop his own probable cause for a traffic violation before stopping the minivan but that he should make the stop look routine.

Steen stopped the minivan, and Sioux Falls Police Officer Jason Christensen arrived to provide assistance. Steen approached the driver's side and Christensen approached the passenger's side. Steen falsely told Morales, who was driving, that his brake light was out and asked him to step out of the vehicle. For his part, Christensen asked Guzman, who was sitting in the passenger seat, also to exit. When Guzman obliged, Christensen saw a small plastic bag containing marijuana between the passenger seat and the doorsill. The officers placed Morales and Guzman in handcuffs. Steen and Christensen searched the minivan and found a pound of marijuana, various cell phones, cash, and a small digital scale that tested positive for methamphetamine. Searches of Guzman's person revealed a loaded Glock 19, approximately 29 grams of methamphetamine, and drug paraphernalia.

Based on this evidence, Warkenthien obtained a search warrant for, among other things, Young Running Crane's home and the Kansas-plated pickup truck registered to Guzman. A search of the home produced two pounds of marijuana and two pounds of methamphetamine. In the pickup truck, law enforcement officers found ammunition for the Glock 19.

A superseding indictment charged Guzman and Morales with one count of conspiracy to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. It also charged Guzman with one count of using or carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

On appeal, both defendants challenge the district court's denial of their respective motions to suppress and raise various sentencing issues. Morales also challenges one of the district court's pretrial evidentiary rulings. We address the

district court's denial of the motions to suppress first, followed by Guzman's sentencing challenge and Morales's evidentiary and sentencing arguments.

II

"We review the denial of a motion to suppress *de novo* but the underlying factual determinations for clear error, giving due weight to inferences drawn by law enforcement officials." United States v. Walker, 840 F.3d 477, 483 (8th Cir. 2016) (quoting United States v. Hurd, 785 F.3d 311, 314 (8th Cir. 2015)). "To conclude that findings of fact are clearly erroneous, the court's review of the record should leave a definite and firm conviction that a mistake has been made," and "the appellate court should give particular deference to findings based upon credibility determinations." Prince v. Sargent, 960 F.2d 720, 720–21 (8th Cir. 1992) (per curiam). We will affirm the denial of a motion to suppress unless the decision "is unsupported by substantial evidence, is based on an erroneous interpretation of the law, or it is clear, based on the entire record, that a mistake was made." Walker, 840 F.3d at 483.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop constitutes a seizure and therefore must be supported at least by reasonable suspicion. United States v. Givens, 763 F.3d 987, 989 (8th Cir. 2014). Reasonable suspicion exists "when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Navarette v. California, 134 S. Ct. 1683, 1687 (2014) (quoting United States v. Cortez, 449 U.S. 411, 417–18 (1981)). In deciding whether there is reasonable suspicion, "an officer may rely on information provided by other officers as well as any information known to the team of officers conducting the investigation." United States v. Mora-Higuera, 269 F.3d 905, 910 (8th Cir. 2001) (quoting United States v. Thomas, 249 F.3d 725, 728 (8th Cir. 2001)); see also Navarette, 134 S. Ct. at 1688.

-6-

Morales and Guzman argue that Steen's stop of the minivan violated their Fourth Amendment rights and that all evidence obtained as a result of that stop must be suppressed as fruit of the poisonous tree. They contend that they were not specifically identified as the occupants of the van before the stop, depriving Steen of reasonable suspicion to believe the minivan's occupants were engaged in criminal activity. The district court found that before agents directed Steen to stop the minivan, they had "positive[ly] identifi[ed] that the occupants of the grey van were in fact [Morales] and [Guzman]." This finding of fact is amply supported by the record.

Fair's and Buiter's testimony at the suppression hearing established that agents identified Morales and Guzman at various points throughout the day and specifically as the two defendants drove away from Young Running Crane's home shortly before Steen's traffic stop. According to Fair, immediately before Morales and Guzman drove to the home from the Days Inn parking lot, agents identified Morales and Guzman getting into the minivan. When the minivan arrived at the home, another agent identified Morales and Guzman as exiting the minivan and entering the residence. Finally, Buiter personally saw Morales and Guzman—both of whom he positively identified—exit the home and get into the minivan once more, information he communicated to the rest of the surveillance team before Steen was directed to make the stop.

In essence, Morales and Guzman ask us on appeal to disbelieve the agents' testimony, but as we have stated many times, "[a] credibility determination made by a district court after a hearing on the merits of a motion to suppress is 'virtually unassailable on appeal.'" United States v. Frencher, 503 F.3d 701, 701 (8th Cir. 2007) (quoting United States v. Guel-Contreras, 468 F.3d 517, 521 (8th Cir. 2006)). Accordingly, the district court did not clearly err in finding that law enforcement officers knew that Morales and Guzman were inside the minivan before it was

stopped.[2]  We therefore affirm the district court's denial of each defendant's motion to suppress.

III

Guzman's advisory range under the U.S. Sentencing Guidelines was 135 to 168 months' imprisonment for the drug offense, subject to a 120-month statutory mandatory minimum.  His firearms offense subjected him to an additional mandatory minimum sentence of 60 months' imprisonment, to be served consecutively as required by statute.[3]  At sentencing, Guzman urged the district court to apply the "rationale" of Dean v. United States, 137 S. Ct. 1170 (2017), to vary below the 120-month mandatory minimum sentence on the drug offense by taking into account that he must additionally serve the 60-month sentence for the firearms offense.  The

---

[2]Without much meaningful analysis, Morales and Guzman also contend that even if they were positively identified as occupying the van before the stop, Steen still lacked reasonable suspicion to stop them.  They do not dispute that Steen learned the details of the investigation from Christiansen, so we construe their argument to be that the facts Steen knew were legally insufficient to support reasonable suspicion. We reject that argument.  The information provided by the CI (much of which was corroborated by the investigation team), the controlled buy between Morales and CI, the recorded conversations between the two, and the investigation team's own observations gave Steen reasonable suspicion to believe Morales and Guzman were engaged in drug-related criminal activity.  See, e.g., Navarette, 134 S. Ct. at 1687–92 (reaffirming the well-established rule that even the statements of an anonymous tipster can provide reasonable suspicion to conduct an investigatory stop of a car); United States v. Caswell, 436 F.3d 894, 898 (8th Cir. 2006) (explaining that an officer may use a reliable confidential informant's tip to establish the more demanding standard of probable cause).

[3]Under § 924(c), a separate term of imprisonment must be imposed where the defendant, "during and in relation to any . . . drug trafficking crime . . . uses or carries a firearm."  This separate term is "in addition to the punishment provided for such . . . drug trafficking crime."  18 U.S.C. § 924(c)(1)(A); see also id. § 924(c)(1)(D)(ii).

district court rejected Guzman's argument but varied downward to the statutory minimum on the drug offense and imposed a total sentence of 180 months.

On appeal, Guzman argues that the district court misinterpreted <u>Dean</u> in concluding that the court lacked the authority to vary below the statutory minimum on the drug offense. The government counters that Guzman's challenge is barred by the appeal waiver in his plea agreement. Guzman acknowledges that his plea agreement waived "his right to appeal any non-jurisdictional issues," except, as relevant here, a sentencing decision involving an upward departure or upward variance. But he contends that the government forfeited its right to enforce the appeal waiver by failing to object at the district court when Guzman "preserve[d]" the <u>Dean</u> issue for appeal.

Courts seem to disagree on whether the government forfeits its right to enforce an appeal waiver if it fails to object before the district court to a defendant's intent to appeal or the district court's advisement that the defendant retains the right to appeal. <u>Compare</u> <u>United States v. Alford</u>, 147 F. App'x 45, 49 (10th Cir. 2005) (concluding that the government did not forfeit right, as "the district court does not decide the effect of any waiver on appellate rights—[the court of appeals] does"), <u>with</u> <u>United States v. Mercado</u>, 525 F. App'x 574, 575 (9th Cir. 2013) ("[T]he government forfeited its right to enforce the waiver by failing to object to the district court's unqualified advisement that [defendant] retained the right to appeal the court's judgment."). We decline to weigh in here, because, assuming for the sake of argument that the government forfeited its right to enforce the appeal waiver, Guzman's sentencing challenge fails on the merits.

Contrary to Guzman's contentions, <u>Dean</u> does not authorize district courts to impose a sentence below a *statutory* mandatory minimum. <u>Dean</u> merely held that courts can consider the § 924(c) mandatory consecutive sentence when deciding whether to vary downward from the *Guidelines range* applicable to the other counts

of conviction. 137 S. Ct. at 1176–77. Therefore, <u>Dean</u> has no application here. We accordingly affirm Guzman's sentence.

IV

A

Morales first challenges the district court's denial of his motion under Federal Rules of Evidence 404(b) and 403 to exclude at trial evidence of uncharged conduct, specifically, that he possessed, used, accessed, or sold marijuana and firearms. The district court agreed with the government that evidence referencing Guzman's Glock 19 and a different gun that another co-conspirator allegedly possessed at Young Running Crane's home was admissible because it was probative of, and "intertwined" with, the methamphetamine conspiracy. Specifically, the district court found that testimony about those two firearms indicated that Morales sought "to keep the drugs safe" and to ensure that nothing would go "wrong" during the drug deals. The district court did, however, preclude all other references to firearms. It also found that evidence of marijuana was similarly "inextricably intertwined" with the methamphet-amine conspiracy, in particular because its discovery in the minivan "then led to the search warrant of [Young Running Crane's] residence where [officers] found methamphetamine and more marijuana." And the district court found that any danger of unfair prejudice that admission of the evidence could pose to Morales was outweighed by the evidence's probative value. On appeal, we review a district court's evidentiary rulings for an abuse of discretion. <u>United States v. Thomas</u>, 760 F.3d 879, 883 (8th Cir. 2014).

Rule 404(b) "excludes evidence of specific bad acts used to circumstantially prove a person has a propensity to commit acts of that sort." <u>United States v. Johnson</u>, 439 F.3d 884, 887 (8th Cir. 2006). But this rule does not apply to evidence "intrinsic" to the charged offense. <u>Thomas</u>, 760 F.3d at 883–84. "[I]ntrinsic

evidence[] is evidence of wrongful conduct other than the conduct at issue offered for the purpose of providing the context in which the charged crime occurred." United States v. Campbell, 764 F.3d 880, 888 (8th Cir. 2014) (cleaned up). It "includes both evidence that is inextricably intertwined with the crime charged as well as evidence that merely 'completes the story' or provides context to the charged crime." United States v. Young, 753 F.3d 757, 770 (8th Cir. 2014). Intrinsic evidence need not be "*necessary* to the jury's understanding of the issues" to be admissible. Id. Of course, when admitting intrinsic evidence, "[t]he dictates of [R]ule 403 must still be applied to ensure that the probative value of this evidence is not outweighed by its prejudicial value." United States v. Bass, 794 F.2d 1305, 1312 (8th Cir. 1986). District courts have "broad discretion" in admitting intrinsic evidence and we will reverse "only if such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." Thomas, 760 F.3d at 883 (quoting United States v. Katz, 445 F.3d 1023, 1029 (8th Cir. 2006)).

Here, the district court did not abuse its discretion in admitting as intrinsic evidence the references to Morales's involvement with marijuana and two firearms. The district court could reasonably conclude that such evidence was "inextricably intertwined" with the methamphetamine conspiracy, or that at the very least it completed the story or provided context to that crime. See id. at 884–85 (affirming admission of evidence of defendant's distribution of crack cocaine, although he was only charged with heroin-related offenses). At the Days Inn, Morales told the CI that there was both marijuana and methamphetamine at Young Running Crane's home, and that a co-conspirator there "ha[d] a pistol guarding the meth." That same day, agents heard that Guzman possessed a Glock 19 intended for "protection" during drug sales. This fact motivated the agents, at least in part, to seek assistance in stopping the minivan with a marked patrol car. Marijuana discovered in the minivan, in turn, led to the search of Young Running Crane's home, where law enforcement officers ultimately found the methamphetamine. Other drug- or weapons-related evidence is not invariably admissible as intrinsic evidence in a drug trafficking prosecution, but

-11-

the district court was within its discretion in admitting the evidence here. And "recogniz[ing] the overall strength of the government's case and not[ing] that this evidence played only a small part," we also conclude that the evidence was properly admitted under Rule 403. United States v. O'Dell, 204 F.3d 829, 834 (8th Cir. 2000).

B

Morales's advisory range under the Guidelines was life imprisonment. The district court varied downward and imposed a 360-month sentence. On appeal, Morales argues that the district court procedurally erred in calculating his base offense level and in applying four sentencing enhancements. We address each of his challenges in turn, reviewing the district court's factual findings for clear error and its construction and application of the Guidelines de novo, United States v. Sykes, 854 F.3d 457, 459 (8th Cir. 2017), keeping in mind that "[t]he Government must prove by a preponderance of the evidence each of the facts necessary to establish a sentencing enhancement," United States v. Razo-Guerra, 534 F.3d 970, 975 (8th Cir. 2008).

First, Morales argues that the district court's finding that he was responsible for 31,289.36 kilograms of marijuana equivalent, resulting in a base offense level of 36 under Guidelines § 2D1.1(c)(2), was clearly erroneous. Before sentencing, an initial presentence investigation report (PSR) recommended a base offense level of 34 based on the 19,951.36 kilograms of marijuana equivalent that law enforcement agents actually confiscated throughout the investigation. The government objected, arguing that additional quantities beyond "those amounts that ended up in the possession of law enforcement" should be included in the total drug amount. Specifically, it argued that the 566.9 grams of methamphetamine (11,338 kilograms of marijuana equivalent) that Morales had offered to sell the CI in April 2016 should also be included. The probation office agreed and amended the PSR, raising the total drug amount to 31,289.36 kilograms of marijuana equivalent and the base offense

-12-

level to 36. Morales objected, arguing that there was "no proof" that he "had access to th[at] quantity" at his April meeting with the CI.

At the sentencing hearing, Warkenthien testified about Morales's insistence that the CI purchase the 566.9 grams of methamphetamine. Warkenthien testified that Morales pushed for the CI to buy that amount as part of Morales's plans to sell only large quantities of methamphetamine. According to Warkenthien, however, the ATF did not make that purchase because the Bureau's internal rules would have required Morales's immediate arrest, effectively shutting down the investigation before agents discovered the identity of Morales's source. Warkenthien's testimony was consistent with the CI's trial testimony that Morales asked him to purchase that quantity of methamphetamine for $16,500. At the conclusion of the sentencing hearing, the district court overruled Morales's objection to the 566.9 grams and adopted the amended PSR's drug quantity calculation.

We conclude that the district court did not clearly err in including the 566.9 grams of methamphetamine in the final drug amount. Under the Guidelines, even drugs that were not confiscated can be attributed to a defendant where the amount seized does not reflect the scale of the offense. § 2D1.1 cmt. n.5. In such a case, "the court shall approximate the quantity of the controlled substance," id., and may consider all relevant information so long as it is sufficiently reliable, see United States v. Sicaros-Quintero, 557 F.3d 579, 582 (8th Cir. 2009). In this case, more than sufficient evidence, including Warkenthien's testimony at the sentencing hearing, supports a finding that Morales could have provided the 566.9 grams of methamphetamine to the CI had the ATF agreed to purchase it.

Based on a statement the district court made at the sentencing hearing, Morales nevertheless argues that the court clearly erred in including the 566.9 grams. When ruling on the final drug amount, the court stated, "I find that all of the quantities set forth in [the amended PSR] . . . are amounts that were actually confiscated." But the

-13-

government never argued that the 566.9 grams were seized. To the contrary, it expressly urged the district court to include that amount *despite the fact* that it had not been confiscated. When the basis of the parties' point of contention is this clear, we would be remiss to conclude that the district court ruled on something other than the precise issue before it. Cf. United States v. Miles, 499 F.3d 906, 909–10 (8th Cir. 2007) (in sentencing context, where the record made clear that district court listened to parties' arguments and considered supporting evidence, court of appeals would not find that district court failed to consider issue). There was ample evidence to support the district court's drug quantity calculation, and its passing erroneous remark that all the drugs were "confiscated" does not alter the record on this issue. It was undisputed that the 566.9 grams were not in fact confiscated. Accordingly, we find no clear error. See United States v. Lewis-Zubkin, 907 F.3d 1103, 1104 & n.2 (8th Cir. 2018) (per curiam) (affirming district court's application of a sentencing enhancement despite the district court's "passing remark" erroneously suggesting that defendant bore the burden of proof as to the enhancement's application).

Next, Morales argues that the district court clearly erred in applying the two-level enhancement under § 2D1.1(b)(1) for possession of a dangerous weapon (including a firearm). For this enhancement to apply, "[t]he firearm must be connected with the criminal activity." United States v. Savage, 414 F.3d 964, 966 (8th Cir. 2005). "[T]he government must show that '(1) the gun was possessed and (2) it was not clearly improbable that the weapon was connected to the drug offense.'" United States v. Renteria-Saldana, 755 F.3d 856, 859 (8th Cir. 2014) (quoting United States v. Anderson, 618 F.3d 873, 880 (8th Cir. 2010)). The district court found that two independent grounds justified the enhancement: (1) trial evidence that Morales "rack[ed] a gun" in the CI's presence at the Days Inn on September 22 while the two discussed the sale of drugs; and (2) officers' discovery of the Glock 19 on Guzman's person the day of Morales's arrest. Morales does not contest the second justification, but argues that trial evidence was "inconclusive" as to the first. We need not address his argument, as Guzman's possession of the gun

-14-

in the minivan Morales was driving shortly after Morales discussed that very weapon with the CI is sufficient to justify the enhancement. See United States v. Lopez, 384 F.3d 937, 944 (8th Cir. 2004) (per curiam) (explaining that the enhancement applies if "the defendant knew or should have known based on specific past experiences with the co-conspirator that the co-conspirator possessed a gun and used it during drug deals"); see also United States v. Muniz Ochoa, 643 F.3d 1153, 1157 (8th Cir. 2011). Accordingly, the district court did not clearly err in applying the enhancement.

Morales next contends that the district court clearly erred in applying a two-level enhancement under § 2D1.1(b)(2). That enhancement applies "[i]f the defendant used violence, made a credible threat to use violence, or directed the use of violence." The district court found that Morales used social media messages to threaten physical violence against at least three different people; specifically, the court found that "there [were] individuals that owed money to the defendant and . . . if they didn't pay . . . they would suffer physical violence." Morales argues that the messages lacked credible threats and cannot be linked to the drug conspiracy. His arguments are belied by the record. In the messages, Morales threatened to "smash" the face of one of the recipients and, in the context of drug-trafficking activity, told another to "[g]et [his] money rite [sic]" because Morales was "trigger happy." Warkenthien testified that in at least one of the messages, Morales expressed displeasure with the recipient's "method of dealing meth." Based on this evidence, the district court did not clearly err in finding that Morales made a credible threat to use violence in connection with the drug conspiracy. See, e.g., Lewis-Zubkin, 907 F.3d at 1104 (explaining that enhancement may be applied even where the threatened violence is not ultimately carried out).

Finally, Morales argues that the district court clearly erred in applying a four-level enhancement under § 3B1.1(a), which applies "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." To justify the enhancement, the government must prove

-15-

two elements: (1) that "the defendant organized or led at least one other participant in the criminal activity"; and, as relevant here, (2) that "the criminal activity involved at least five participants." United States v. Musa, 830 F.3d 786, 788 (8th Cir. 2016). The district court found that Morales was a "leader or organizer" and that there were five participants involved in the criminal activity: (1) Morales, (2) Guzman, (3) a third co-defendant, (4) Young Running Crane, and (5) the source of the methamphetamine. Morales challenges only the five-participant determination, arguing that Young Running Crane and his drug source were improperly classified as participants.

The Guidelines define "participant" as "a person who is criminally responsible for the commission of the offense," even if he or she was not convicted. § 3B1.1 cmt. n.1. Importantly here, "[t]he term 'offense' encompasses not only the elements and acts cited in the count of conviction, but also all relevant conduct constituting the 'contours of the underlying scheme itself.'" United States v. Starks, 815 F.3d 438, 441 (8th Cir. 2016) (quoting United States v. Rosnow, 9 F.3d 728, 730 (8th Cir. 1993)). And to be "criminally responsible" under the Guidelines, an individual need only "give 'knowing aid in some part of the criminal enterprise.'" Id. (quoting United States v. Hall, 101 F.3d 1174, 1178 (7th Cir. 1996)). Contrary to Morales's contention, an individual need not be guilty of the precise offense of conviction—or even charged—to be found "criminally responsible" under § 3B1.1. See, e.g., Starks, 815 F.3d at 441; United States v. Mendoza, 341 F.3d 687, 693 (8th Cir. 2003).

The district court did not clearly err in finding that Young Running Crane and Morales's source were criminally responsible for relevant conduct. The government presented evidence that Young Running Crane knowingly permitted Morales, Guzman, and the third co-conspirator to store a "brick-size" quantity of marijuana—at least one pound—at her home shortly before the conspirators' arrest. The PSR, as adopted by the district court, included that marijuana as relevant conduct, which Morales does not contest on appeal. See United States v. Gordon, 510 F.3d 811, 817 (8th Cir. 2007) ("The district court may consider as relevant conduct all drugs that the

government shows by a preponderance of the evidence were a part of the same course of conduct or common scheme as the conspiracy . . . .").  Similarly, ample evidence supports the district court's conclusion that Morales's source was a participant.  We have held that an ongoing supplier relationship may establish participant status under § 3B1.1(a).  See Sykes, 854 F.3d at 460.  Warkenthien's testimony supports a finding that Morales had an ongoing relationship with at least one source who was behind Morales's plan to sell large quantities of methamphetamine in the Sioux Falls area.  For instance, Warkenthien testified that it angered Morales that the CI would not purchase the 566.9 grams of methamphetamine, as Morales "was trying to show . . . his source that he could move this kind of quantity . . . in Sioux Falls, and they could get rid of it and bring up large quantities quickly to make more money."  In light of this evidence, the district court did not clearly err in applying the four-level enhancement under § 3B1.1(a).

For all of the foregoing reasons, we affirm Morales's conviction and sentence.

_____