# United States Court of Appeals

### For the Eighth Circuit

_____

No. 24-1888

_____

United States of America

*Plaintiff - Appellee*

v.

Juan Francisco Alvarez-Sorto, also known as Juan Francisco Alvarez, also known as Juanito R., also known as Juan Jr.

*Defendant - Appellant*

_____

No. 24-1949

_____

United States of America

*Plaintiff - Appellee*

v.

Deyvin Morales, also known as Deyvin Eliabid Escriba Morales, also known as Deybi Eleabit Escriba Morales, also known as Guate, also known as Watay, also known as Chapine

*Defendant - Appellant*

_____

Appeals from United States District Court
for the District of South Dakota - Western

_____

Submitted: May 15, 2025
Filed: December 3, 2025
_____

Before BENTON, GRASZ, and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

A drug run ended in the carjacking and kidnapping of an FBI specialist who happened to be driving by. Neither defendant's luck has improved on appeal, despite raising multiple challenges. We affirm.

## I.

Juan Alvarez-Sorto and Deyvin Morales were drug dealers based in Greeley, Colorado. Their customers, however, were from all over, including South Dakota.

While speeding through the state, they caught the attention of a highway patrolman. When he tried to pull them over, they sped up and entered the Pine Ridge Indian Reservation. Low on gas and with no backup in sight, he called off the chase.

It turned out that Alvarez-Sorto, Morales, and their passenger, Karla Lopez-Gutierrez, were in no better shape. Their vehicle, a Ford Expedition, was also low on fuel. Unfamiliar with their surroundings and unsure whether they could make it to a gas station, they pulled over.

It was not long before another car stopped. Little did they know that the driver was Curt Lauinger, an FBI victim specialist headed back to the office in an FBI-issued Dodge Durango. Though Lauinger thought they were tribal police who needed help, Alvarez-Sorto and Morales took his keys, ordered him to get into the backseat at gunpoint, and drove to a gas station.

-2-

Once there, Lopez-Gutierrez went inside to buy zip ties and a gas can. Lauinger saw his chance to escape when she unlocked the car doors. He climbed over Morales, opened a rear door, and ran inside so the clerk could call 911. Figuring that police officers would soon be on their way, the three drug dealers sped off in the Durango, only to abandon it later in Rapid City.

After investigating the incident and searching the abandoned Ford Expedition, FBI agents arrested Alvarez-Sorto and Morales in Colorado. In an interview conducted shortly after their arrest, Alvarez-Sorto incriminated himself and the others. Morales, who heard about the confession, tried to pass him a note in jail. It contained further details about the crime, including how they had taken a "police car."

The drugs they had brought to South Dakota turned out to be the least of their worries. Prosecutors charged Alvarez-Sorto and Morales with kidnapping a federal officer, *see* 18 U.S.C. § 1201(a)(5); carjacking, *see id.* § 2119(1); using a firearm in connection with a crime of violence, *see id.* § 924(c)(1)(A)(ii); and illegal possession of a firearm, *see id.* § 922(g)(1), (3), (5). Lopez-Gutierrez, for her part, pleaded guilty to several of those crimes and testified against the other two, who were tried jointly.

The parties filed several pretrial motions. As relevant here, the district court[1] denied Morales's requests to sever the trial and for Lauinger's medical records. The government, on the other hand, was able to get the pair's other drug-trafficking activities and redacted portions of Alvarez-Sorto's confession admitted.

The jury found them guilty on all charges, which resulted in lengthy prison sentences: 420 months for Alvarez-Sorto and 564 months for Morales. They appeal multiple issues from their trial and sentencing.

---

[1]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

## II.

The first one is the decision to try them jointly. In Morales's view, playing part of Alvarez-Sorto's confession for the jury violated his constitutional rights and irreparably "prejudice[d]" him. Fed. R. Crim. P. 14(a). And it all could have been avoided if the district court had severed the trial like he asked.

## A.

"We review [the] denial of severance under Rule 14 for an abuse of discretion and will reverse only upon a showing of severe prejudice." *United States v. Milk*, 66 F.4th 1121, 1133 (8th Cir. 2023) (citation omitted). Morales can prevail, in other words, only if he "would have had an appreciable chance for an acquittal in a severed trial." *Id.* (citation omitted). His theory hinges on the content of Alvarez-Sorto's confession, which he believes would have been inadmissible had he been tried alone. *See Crawford v. Washington*, 541 U.S. 36, 68 (2004) (holding that "testimonial evidence" is only admissible when the defendant has an "opportunity for cross-examination").

Even if we assume he is right, much of what the jury heard in the confession was not about the South Dakota drug run, the carjacking, or the kidnapping. It covered why Alvarez-Sorto moved to Greeley, where *he* lived, and how he usually brought a rifle with him while traveling. The government redacted the parts discussing Morales, leaving only background facts that had a minimal impact on him.

Contrast the short excerpts from Alvarez-Sorto's videotaped confession with the lengthy testimony of Lopez-Gutierrez and Lauinger that chronicled the events of the botched drug run in detail, from the high-speed chase with the highway patrolman to Lauinger's gas-station escape. On those points, the government presented "overwhelming evidence of [Morales's] guilt" that would have been the

-4-

centerpiece of its case against him in a severed trial. *United States v. Mason*, 982 F.2d 325, 328 (8th Cir. 1993). In short, he cannot say that the "denial of severance affected the jury verdict." *Id.*

## B.

The same goes for the argument that playing the videotaped confession violated the Confrontation Clause, which protects codefendants from implicating one another through "pretrial confession[s]." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). Unless a codefendant whose confession "expressly implicat[es] the [non-confessing] defendant" takes the stand, the government must make a choice: introduce it and move for severance or try the defendants jointly and leave it out. *Id.* at 208 (citation omitted); *see Bruton v. United States*, 391 U.S. 123, 137 (1968).

Here, however, the confession did not "incriminat[e]" Morales "on its face." *Richardson*, 481 U.S. at 208. It included multiple background facts, which at most "linked" him to the crime with the other evidence "introduced . . . at trial." *Id.* When the confessing codefendant does not take the stand, like Alvarez-Sorto, the district court should instruct the jury to consider the confession only against him. *See id.* at 206.

The district court never gave the limiting instruction, despite a promise by the magistrate judge that Morales would receive one. *See id.* at 211 (holding that a "limiting instruction" is "proper" when admitting "a non[-]testifying codefendant's confession" at a joint trial). When the time came, Morales's counsel forgot to remind the district court, so our review is for plain error. *See United States v. Gayekpar*, 678 F.3d 629, 637 (8th Cir. 2012).

Even though the failure to give a limiting instruction in this situation qualifies as a plain error, we will reverse only if Morales can "show a reasonable probability that the outcome would have been different" had he been given one. *Id.* at 638. Consistent with what we have already said, we do not think it would have made any

difference, given that the excerpts the jury heard from Alvarez-Sorto's confession never mention the events in South Dakota, much less the role Morales played in them. If anything, it might have drawn further attention to the fact that his codefendant had confessed, which would have made things worse for Morales considering the other evidence of his guilt. *Cf. Gray v. Maryland*, 523 U.S. 185, 193 (1998) (noting that a redaction in a confession might "call the jurors' attention specifically to the removed name" and "overemphasize the importance of the confession's accusation").

## III.

The Confrontation Clause was also the reason that Morales requested Lauinger's medical records. He wanted to counter Lauinger's testimony that they manhandled and threw him to the ground, which led to some bruising and elbow pain. *See* 18 U.S.C. § 2119 (requiring the taking of a "motor vehicle . . . by force and violence"). The hope was to impeach him and show that the amount of force used during the carjacking and kidnapping was less than he claimed.

The district court denied the request because it found that everything Morales needed had already been turned over by the government.[2] *See United States v. Arias*, 936 F.3d 793, 799 (8th Cir. 2019) (holding that the Confrontation Clause only "guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish" (emphasis omitted) (citation omitted)). The amount of force used did not matter, just that it was "*capable* of causing physical pain or injury." *Johnson v. United States*, 559 U.S. 133, 140 (2010) (emphasis added) (discussing the term "physical

---

[2]Nor did Federal Rule of Criminal Procedure 16(a)(1)(E) require it to provide access to the records. "[D]ocuments" and "tangible objects" in the government's possession are only discoverable when (1) "the item is material to preparing the defense," (2) "the government intends to use [it] in its case-in-chief at trial," or (3) it "was obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E)(i)–(iii). None of these circumstances were present here.

force" in the definition of "crime of violence" in 18 U.S.C. § 924); *see Stokeling v. United States*, 586 U.S. 73, 87 (2019) (clarifying that *Johnson*'s definition of "physical force" includes as little force as "the amount . . . necessary to overcome a victim's resistance" (citation omitted)). Although Morales has his doubts, other evidence established that it could, so limiting discovery did not deprive him of "an opportunity for *effective* cross-examination." *Arias*, 936 F.3d at 799 (emphasis modified) (citation omitted).

IV.

At other points, the joint trial produced agreement between Alvarez-Sorto and Morales. One example was their objection to evidence of drug activity leading up to and after the carjacking and kidnapping. The district court decided to admit all of it, either as intrinsic evidence of the crimes they committed, *see United States v. Parks*, 902 F.3d 805, 813–14 (8th Cir. 2018), or as extrinsic other-bad-acts evidence, *see* Fed. R. Evid. 404(b)(2). Whether either theory works depends on the charges the government brought and the evidence needed to prove them. *See United States v. Vaca*, 38 F.4th 718, 720–21 (8th Cir. 2022). We review evidentiary admit-or-not decisions "for an abuse of discretion." *Id.* at 720.

A.

Sometimes bad acts are intrinsic, meaning they are part of the "charged offense," *United States v. Maxwell*, 643 F.3d 1096, 1100 (8th Cir. 2011) (citation omitted), and provide "context" for how or why it happened, *United States v. Guzman*, 926 F.3d 991, 1000 (8th Cir. 2019). Examples include "logically . . . prov[ing] any element of [a] crime charged," "complet[ing] the story," or showing "consciousness of guilt." *Vaca*, 38 F.4th at 721 (first alteration in original) (citation omitted).

None of the evidence here "logically prove[d]" an element of any charged crime. *Id.* Whether they had drugs in South Dakota or elsewhere does not make any

"fact . . . of consequence in determining" whether the defendants committed the specific elements of carjacking, kidnapping, or possessing a firearm "more or less probable." Fed. R. Evid. 401 (defining relevance).

Nor is it relevant to show consciousness of guilt. Here, once again, the problem is that it must relate to one of the charged offenses. For example, "threatening a witness," *Vaca*, 38 F.4th at 721, or tossing a gun after a crime is over. Possessing drugs, on the other hand, is "unrelated to the charges [they] faced." *Id.* at 722. Much of it also *preceded* the charged offenses. It would be unusual for a defendant to show consciousness of guilt for a crime that had yet to happen. *See United States v. Hankins*, 931 F.2d 1256, 1261 (8th Cir. 1991) (noting that flight or escape after the crime may show consciousness of guilt); *see also United States v. Foster*, 309 F.2d 8, 13 (4th Cir. 1962) ("If the behavior is to prove consciousness of guilt, it obviously must have occurred subsequent to the offense.").

Whether the drug evidence completes the story gives us a mixed answer, yes for day-of possession and no for the rest. The latter completes the "wrong" story, one that occurred at other times and hundreds of miles away. *Vaca*, 38 F.4th at 721. Without a drug-conspiracy charge or some other way to connect it with the charged offenses, nothing "inextricably intertwine[s]" the two. *Guzman*, 926 F.3d at 1000 (citation omitted); *see Maxwell*, 643 F.3d at 1100 (explaining why the government has "considerable leeway" to introduce other offenses "[i]n conspiracy cases" (citation omitted)).

We bookend our holding by coming out the *opposite* way on the drugs they had with them on the day they carjacked and kidnapped Lauinger. Possessing them "complete[d] the story" of why they took extreme measures rather than calling a tow truck or the tribal police when they ran out of gas. *Vaca*, 38 F.4th at 721. A jury could reasonably infer that carrying illegal drugs made them less willing to call for help, which is what most people would do under the circumstances, and provided a potential reason why the day turned violent. In other words, it provided "context" for what they did. *Guzman*, 926 F.3d at 1000.

B.

Although not intrinsic to the crimes charged, the other drug evidence was still admissible extrinsically to prove motive under Fed. R. Evid. 404(b). The government's theory was that the carjacking and kidnapping reflected their desperation to get moving again without alerting law enforcement. A typical response to the scenario they faced, low on gas and in an unfamiliar place, would be to call for roadside assistance. But for drug dealers like them, doing so would draw unnecessary attention. Highlighting their drug activity provided the jury with an additional relevant, non-propensity reason why running out of gas caused them to act in an atypical, violent way. *See United States v. Williams*, 796 F.3d 951, 959 (8th Cir. 2015) (requiring other-bad-acts evidence to be "relevant to a material issue" (citation omitted)).

Assuming, of course, that it also satisfied the remaining parts of our Rule 404(b) test, which asks whether the evidence was (1) "similar in kind and not overly remote in time to the crime charged"; (2) "supported by sufficient evidence"; and (3) not "substantially" more prejudicial than probative. *Williams*, 796 F.3d at 959 (citation omitted). Here, the other drug activity took place in the weeks surrounding the crime, there was no real dispute it happened, and its significant probative value was in providing a motive for the carjacking and kidnapping. *See id.* In short, the district court did not abuse its discretion in admitting it.

V.

With the preliminary issues out of the way, our next task is to evaluate the sufficiency of the evidence. Both Alvarez-Sorto and Morales moved for an acquittal,[3] so our review is "de novo, viewing the evidence in the light most

[3]The court accurately instructed the jury on the elements of the crimes as they existed at the time. *See, e.g.*, 18 U.S.C. § 924(c)(1)(A)(ii) (in effect from

-9-

favorable to the government and drawing all reasonable inferences in favor of the verdict." *United States v. Streb*, 36 F.4th 782, 790 (8th Cir. 2022).

## A.

The federal kidnapping statute has two unique elements. Morales challenges the sufficiency of the evidence on one and Alvarez-Sorto on the other.

## 1.

Morales's argument is that the government did not prove that he kidnapped Lauinger for "ransom or reward or otherwise." 18 U.S.C. § 1201(a). Satisfying this element requires "the person kidnapped [to be] taken for some reason that the defendant considered of sufficient benefit to him, or for some purpose of his own." *United States v. Ford*, 726 F.3d 1028, 1034 (8th Cir. 2013) (citation omitted). Committing the crime here provided the group with two benefits over and above "whatever satisfaction [came] from the kidnapping itself." *United States v. Abdullahi*, 144 F.4th 1034, 1046 (8th Cir. 2025) (Stras, J., concurring in part and concurring in the judgment) ("As a matter of plain meaning, the benefit must be above and beyond whatever satisfaction comes from the kidnapping itself.").

One was using the Dodge Durango to get gas for the Ford Expedition, which had drugs hidden inside. Getting it moving again was key to their drug-running plan. The other was that, by bringing Lauinger along, he could not "report[]" the carjacking. *Ford*, 726 F.3d at 1035 (explaining that "prevent[ing]" a victim "from reporting a" crime qualifies). Either way, a reasonable jury could conclude that Morales and the others kidnapped Lauinger for "ransom or reward or otherwise." 18 U.S.C. § 1201(a); *see Streb*, 36 F.4th at 790.

---

December 21, 2018, to June 24, 2022); *see also* U.S. Const. art. I, § 10, cl. 1; *Collins v. Youngblood*, 497 U.S. 37, 52 (1990).

2.

Alvarez-Sorto's challenge goes to the jurisdictional-nexus requirement. Here, it came from Lauinger's status as a federal officer. *See* 18 U.S.C. § 1201(a)(5). For it to apply, however, he must have been "engaged in . . . the performance of official duties." *Id.*

No bright-line rule exists, other than "personal frolic[s]" fall outside the statute. *United States v. Brown*, 76 F.4th 1073, 1077 (8th Cir. 2023) (citation omitted). To make the determination, we must assess whether an employee is "acting within the scope of what [he] [wa]s employed to do." *Id.* (citation omitted). That is, "whether [an] officer's actions fall within the agency's overall mission" or are otherwise "what [he] ought to [be] do[ing]." *Id.* (citation omitted).

When Lauinger spotted the stalled Ford Expedition, he was on his way back to the office after visiting a federal crime scene at the direction of a supervisor. Throughout the day, he had been wearing his official FBI uniform and driving an FBI-issued vehicle. *See United States v. Hoffer*, 869 F.2d 123, 126 (2d Cir. 1989); *United States v. Kelley*, 850 F.2d 212, 215 (5th Cir. 1988); *United States v. Stephenson*, 708 F.2d 580, 581 (11th Cir. 1983). He had even called into the FBI's field headquarters multiple times to provide updates.

Based on these facts, the record supports the jury's conclusion that Lauinger was still "engaged in . . . the performance of official duties" when he ran into Alvarez-Sorto and Morales. 18 U.S.C. § 1201(a)(5); *see Streb*, 36 F.4th at 790. Like the Secret Service agent who stopped to help the victim of a car accident while "driving a government vehicle to investigate a . . . case," Lauinger was still acting within the FBI's overall mission when he stopped to help what he thought were tribal police officers stranded on the side of the road. *Kelley*, 850 F.2d at 215; *see Hoffer*, 869 F.2d at 126 (concluding that a DEA agent "using her government-owned automobile . . . to return from [a] surveillance assignment" was "engage[d] in official duty"); *United States v. Boone*, 738 F.2d 763, 765 (6th Cir. 1984) (holding

-11-

that a kidnapping victim was "discharging her mission as a federal appeals court judge" while "walking to the federal courthouse to do legal research for her sitting the next morning"). He was only there, after all, because the FBI required him to be. *See Brown*, 76 F.4th at 1077.

It makes no difference that he had been speeding shortly before he stopped. *See id.* ("We do not look merely to whether the officer is . . . abiding by the laws and regulations in effect at the time of the incident." (citation omitted)). Nor that he took a brief break earlier to call his wife. Even if the momentary pause *was* "a personal frolic," he was not "engag[ed] in it" when the kidnapping occurred. *Id.* (citation omitted). In short, a reasonable jury could conclude that the jurisdictional nexus had been met.

B.

The same goes for the finding that Alvarez-Sorto used a firearm during the carjacking. *See* 18 U.S.C. § 924(c)(1)(A) (prohibiting the use of a firearm in furtherance of a crime of violence). Law enforcement later recovered one from the Greeley apartment he shared with Morales, but he claims it was never in South Dakota.

The evidence pointed both ways. Lopez-Gutierrez testified that the Greeley gun was the same one he used during the carjacking. Lauinger thought it "looked like the weapon that was aimed at [his] head." But another witness who saw Alvarez-Sorto in Rapid City said the one he had that day looked plastic and fake, nothing like the one the government produced at trial.

The conflicting evidence presented a "classic jury call," with both an "innocent [and] culpable explanation" possible. *United States v. Fortier*, 956 F.3d 563, 568 (8th Cir. 2020). The jury's job was to figure out which to believe. *See United States v. Stenger*, 605 F.3d 492, 504 (8th Cir. 2010) (observing that the government "is not required to disprove the theoretical possibility" that a gun was

-12-

fake). Unfortunately for him, it believed that the gun he brought that day was real, not fake.

## VI.

Sentencing produced its own set of challenges. Between Morales and Alvarez-Sorto, there are four to cover, two each. "In evaluating [them], we review the district court's construction and application of the sentencing guidelines de novo and its factual findings for clear error." *Streb*, 36 F.4th at 789.

## A.

The first pair arises out of the four-level enhancement Morales received for inflicting a "permanent . . . bodily injury" on Lauinger during the kidnapping. U.S.S.G. § 2A4.1(b)(2)(A). It affected both ends of the advisory range, increasing it to 360 months to life in prison. The district court settled on 564 months.

The enhancement was for the ulnar nerve pain Lauinger continued to experience after the carjacking and kidnapping. Morales does not dispute that he suffered an injury, only whether the evidence supported the conclusion it was permanent. He points to Lauinger's statement at trial that the "damage" to his elbow "continued . . . *until* [he] had it treated several months later." (Emphasis added). If it responded to treatment, he claims, it could not be permanent, even if Lauinger's doctor believed otherwise. *See United States v. Tucker*, 243 F.3d 499, 506 (8th Cir. 2001) (observing that it is clear error to rely on testimony that is "incoherent or facially implausible[,] . . . contradicted by extrinsic evidence[,]" or "internally inconsistent").

Morales takes an overly narrow view of the evidence. Two things can be true at once: an injury can cause permanent damage but still improve with treatment. For example, the treatment could have reduced his pain to manageable levels. Or he could have experienced temporary improvement, only for the pain to return later.

-13-

Either scenario, consistent with the testimony he *and* his doctor gave, would still reflect a "permanent . . . injury." *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) (concluding that it "can virtually never be clear error" to credit facially plausible testimony unless it is "contradicted by extrinsic evidence" or "internally inconsistent").

To the extent he raises a substantive-reasonableness challenge, it also fails. The record establishes that the district court sufficiently considered the statutory sentencing factors, *see* 18 U.S.C. § 3553(a), and did not rely on an improper factor or commit a clear error of judgment. *See United States v. Ward*, 686 F.3d 879, 884 (8th Cir. 2012). It emphasized his role as a leader, his attempts to cover up what happened, and the pain and trauma he caused Lauinger. More than enough to justify the sentence he received. *See* 18 U.S.C. § 3553(a)(2)(A), (C) (emphasizing "the need for the sentence imposed" to "reflect the seriousness of the offense, . . . promote respect for the law," and "protect the public from further crimes of the defendant").

## B.

The second pair arises from a 98-month upward variance the district court gave Alvarez-Sorto. One reason was its belief that the kidnappers "sure[ly]" would have killed Lauinger had he not escaped. Although the evidence supporting this finding was thin at best, neither of the defendants objected, and only Alvarez-Sorto briefed it on appeal. In these circumstances, relief is available only if the district court committed a plain error that "affected his substantial rights." *United States v. Molnar*, 590 F.3d 912, 914–15 (8th Cir. 2010).

It is a close call, but we conclude there was no plain error here. Although the record does not show that the defendants were "sure" to kill Lauinger, the district court's comment came during its discussion of the trauma he experienced, right after he mentioned in a victim-impact statement that he *believed* he was going to die. An expert witness added that he suffered significant psychological damage, including

from the fear of dying, that left him with PTSD. From there, it was not a "clear or obvious" error to vary upward based on the harm the kidnappers inflicted. *Puckett v. United States*, 556 U.S. 129, 135 (2009).

In varying upward, the district court considered other factors too. Included among them were his history of stealing money from his parents, the decision to hold a gun to the back of Lauinger's head, and the broader drug-dealing enterprise he built. Together with the emotional damage he caused Lauinger, we conclude that the 420-month sentence he received was substantively reasonable.

VII.

We accordingly affirm the judgments of the district court.

_____