# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1781
_____

United States of America

*Plaintiff - Appellee*

v.

Pedro Zambrano, also known as Peter Rivera, also known as JR Acevedo, also known as Manuel Acevedo, also known as Jorge Meraz, also known as Rafael Ramirez, also known as John Crish, also known as Jose Perez, Jose Zavala

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville
_____

Submitted: April 14, 2020
Filed: August 20, 2020
_____

Before SMITH, Chief Judge, BENTON and KOBES, Circuit Judges.
_____

SMITH, Chief Judge.

In July 2018, a grand jury indicted Pedro Zambrano for conspiracy to distribute more than 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and 846. Zambrano pleaded guilty and was sentenced to 240 months'

imprisonment. On appeal, he argues that the district court[1] procedurally erred in calculating his sentence and also challenges his sentence as substantively unreasonable. We affirm.

## I. *Background*

We recite several undisputed facts from the final presentence investigation report (PSR). In April 2017, federal investigators intercepted two phone calls between Zambrano and coconspirator Victor Sanchez-Hernandez ("Sanchez"). The calls occurred after Zambrano returned to Springdale, Arkansas, from Ohio. The investigators also observed Zambrano's vehicle parked at Sanchez's residence. Sanchez, a methamphetamine distributor, returned to Northwest Arkansas in early 2017 after having fled to Mexico in 2014 and resumed selling methamphetamine.

On June 13, 2017, Zambrano and Sanchez discussed selling Percocet—a prescription drug—during intercepted phone calls. They negotiated the terms, and Zambrano assumed responsibility for selling it. Thereafter, Zambrano provided false information to T-Mobile in order to obtain a new telephone number approximately every 30 to 45 days between July and November 2017.

On July 14, 2017, Zambrano informed coconspirator Eduwijes Cervantes-Mendoza ("Cervantes") that "a potential supplier of an unspecified narcotic, likely methamphetamine, . . . could bring the product from Ohio." Second Rev. Final PSR at 8, ¶ 28, *United States v. Zambrano*, No. 5:18-cr-50038-TLB-1 (W.D. Ark. Apr. 3, 2019), ECF No. 309. The pair engaged in the following intercepted phone conversation:

> Zambrano: He'll be back from Ohio Thursday or Friday for sure.
> Cervantes: Secure the deal then.

---

[1]The Honorable Timothy L. Brooks, United States District Judge for the Western District of Arkansas.

Zambrano: The lower the number, the more we can get.
Cervantes: Yes, but we can't go too low. How much?
Zambrano: He said 550.
Cervantes: Lower it more.

*Id.* (bold omitted). Investigators noted that "$550 is consistent with the wholesale price for an ounce of methamphetamine." *Id.* at ¶ 29.

On July 17, 2017,[2] Zambrano and Cervantes talked again by phone. Investigators concluded that a supplier Cervantes had spoken with agreed to sell methamphetamine to the two for a low price if they agreed to pay for it upon receipt.

On July 19, 2017, during another call, Zambrano told Cervantes that he wanted to use Cervantes's residence "to wrap the sexy girls up"—believed to be marijuana—for transporting to an unidentified man in the Memphis, Tennessee area. *Id.* at 9, ¶ 34 (internal quotation omitted). The following day, Zambrano asked if Cervantes "was 'all set.' . . . Cervantes affirmed." *Id.* at ¶ 35. Investigators then observed the two departing from a gas station in Springdale, following each other, and heading southbound on Interstate 49 toward Memphis. About five hours later, Zambrano and the unidentified man agreed to meet at a certain location near Memphis. Based on additional calls, investigators believed that Zambrano had sold 15 pounds of marijuana to the unidentified man at a rate of $625 for each pound. A week later, Zambrano and Cervantes conversed about buying more drugs from their suppliers.

On August 9, 2017, investigators heard Zambrano request "1 or 2 chickens" from Sanchez during an earlier intercepted call and, later that day, heard Zambrano say that he was waiting outside of Sanchez's residence. *Id.* at 10, ¶ 38 (internal

---

[2]On this date, investigators believed that Cervantes also provided Zambrano with "two girls"—a code term for a certain quantity of marijuana. *Id.* ¶¶ 30–31.

quotation omitted). Investigators interpreted "1 or 2 chickens" as coded language for a certain quantity of methamphetamine. *Id.* (internal quotation omitted).

Afterward, investigators tracked Zambrano's whereabouts following a short text exchange between him and coconspirator Michael Shannon Howard ("Howard"). Investigators believed that Zambrano had met with Howard to deliver the methamphetamine that Zambrano had obtained from Sanchez. They watched Zambrano exit the passenger side of Howard's car. An intercepted phone call on August 14 confirmed that Howard had purchased two ounces of methamphetamine, owed Zambrano $2,000 for the purchase, and wanted to buy an additional ounce. On that call, Zambrano and Howard also discussed purchasing cocaine.

On August 11, 2017, Zambrano stated that he had "picked up the girls" during a phone call with Cervantes. *Id.* at ¶ 42 (internal quotation omitted). Zambrano and Howard then met at Cervantes's residence. Investigators observed Howard carry a large box into the apartment and assumed, based on Zambrano's latest phone call with the unidentified man in the Memphis area, that the three had planned to prepare more marijuana for transport.

On August 16, 2017, investigators intercepted another phone conversation between Zambrano and Cervantes. They discussed buying more methamphetamine from Sanchez to sell because Zambrano could not obtain any in Arizona.

The next day, Howard texted a request to buy methamphetamine from Zambrano, who confirmed that he was trying to obtain more for sale. "GPS location data from Zambrano's cellular phone indicated Zambrano traveled to Kings River Country Store on August 17, 2017. [Howard] confirmed he met Zambrano at Kings River Country Store to obtain methamphetamine." *Id.* at 11, ¶ 46.

Also, on August 17, Zambrano and coconspirator Gregory "Smokey" Miranda ("Miranda") conversed by text message about two separate marijuana transactions. Zambrano stated that his uncle would make a delivery to Miranda and demanded $360. Investigators identified Cervantes as Zambrano's uncle. This was confirmed when, later that day, Miranda texted an address to Cervantes—which appeared to be the location for Cervantes to deliver the drug. Zambrano also instructed Cervantes to deliver marijuana to and collect money from Miranda.

The following day, Zambrano called and ordered Cervantes to see Sanchez. Investigators observed Cervantes travel to and enter Sanchez's residence. They believed that Cervantes had procured methamphetamine from Sanchez for resale to Howard. Subsequently, Cervantes notified Zambrano that he had purchased "a 28" "for 650." *Id.* at 12, ¶ 54. Investigators knew that "a 28" referenced "an ounce of methamphetamine," which is typically purchased for $650. *Id.* at ¶ 55 (internal quotation omitted).

On August 21, 2017, while conversing by phone, Zambrano directed Cervantes to meet with and get money from Howard for the methamphetamine. Cervantes eventually met Howard at the Kings River Country Store. Investigators observed Howard get into Cervantes's vehicle with him remaining there for no more than a minute. Howard texted Zambrano afterward, indicating that Cervantes had left.

In late August and September 2017, Zambrano, coconspirator Alexis Rios-Tamayo ("Rios"), and a person referred to as "Chabeton"—located in Mexico—arranged for Zambrano to pick up a large quantity of methamphetamine in San Jose, California. The series of communications revealed that Zambrano had planned to drive to California and use his car to store the methamphetamine. Because he expected to obtain a large quantity of methamphetamine, Zambrano hired a trucking company in Fresno, California, to ship his car back to Northwest Arkansas

on September 8. He intended to resell the methamphetamine in the Northwest Arkansas area. The trucking company was unaware of Zambrano's plan.

On September 5, investigators tracked Zambrano as he traveled west through Oklahoma. Two days later, he arrived in California. While traveling to California, Zambrano and Cervantes talked by phone. Cervantes asked about the "eggs"—later confirmed to be methamphetamine—and Zambrano asked Cervantes to collect money from Zambrano's customers in Northwest Arkansas who had received the methamphetamine. *Id.* at 14, ¶ 65 (internal quotation omitted). Also, by phone, Zambrano confirmed that he could provide Sanchez with a "22-year-old girl" once he returned to Arkansas. *Id.* at ¶ 66 (internal quotation omitted). Investigators later discovered that Sanchez's reference to a "22-year-old girl" was coded language for "a kilogram, or 2.2 pounds, of methamphetamine." *Id.* (internal quotation omitted).

Rios and Sarahi Flores-Quintero ("Flores")—Zambrano's girlfriend and coconspirator—accompanied Zambrano to California. Zambrano suspected that they were being followed by law enforcement on September 7. In a conversation with the unidentified man in the Memphis area, the man texted, "Was it a cop?" *Id.* at 15, ¶ 67. Zambrano responded that "two white guys" in "[a] black explor[er]" were behind them. *Id.* The man then asked, "Did you lose them?" And Zambrano answered, "Yeaa." *Id.*

Out of fear, Zambrano and his companions abandoned his vehicle and left it in a parking lot in Fresno. A canine unit conducted a sniff test of Zambrano's vehicle, and a drug-sniffing dog alerted law enforcement to the presence of narcotics. Based on this, law enforcement obtained a search warrant for Zambrano's vehicle. The warrant-authorized search uncovered approximately nine pounds of a controlled substance—later confirmed to be "3,885 grams of a mixture of methamphetamine with 98% purity level or 3,807 grams of actual methamphetamine." *Id.* at ¶ 70.

After Zambrano's California trip, investigators intercepted more phone calls and text messages between Zambrano and others that occurred during October and November 2017. The communications discussed past debts owed to Zambrano and prices for other potential transactions.

Investigators eventually obtained a federal arrest warrant for Zambrano. Zambrano and Flores moved to Phoenix, Arizona, in late fall 2017 or early spring 2018. There, on April 25, 2018, investigators arrested Zambrano during a traffic stop. Following his indictment, he pleaded guilty to conspiracy to distribute more than 500 grams of methamphetamine.

Based on Zambrano's responsibility for 3.8 kilograms of actual methamphetamine, the PSR calculated his base offense level as 36 pursuant to U.S.S.G. § 2D1.1(c)(2). The PSR also recommended three upward adjustments, and Zambrano objected to all three. The district court adopted and applied two of them: (1) a four-level enhancement for his role as an organizer or leader of five or more participants in accordance with U.S.S.G. § 3B1.1(a); and (2) a two-level enhancement for an attempt to obstruct justice in accordance with U.S.S.G. § 3C1.1. The court also granted Zambrano a two-level decrease for acceptance of responsibility.

In applying the role and obstruction-of-justice enhancements, the district court credited the uncontested factual allegations in the plea agreement and PSR. It found that Zambrano had supervised at least one other participant—specifically, Cervantes—and assumed a leadership role during the conspiracy involving at least five participants. Next, the court found that Zambrano attempted to obstruct justice by submitting an affidavit to the court containing the false statement that Flores, his girlfriend and coconspirator, was unaware of his drug-related activity and that she was innocent. Although his affidavit failed to prevent Flores's prosecution, the court emphasized that Zambrano intentionally submitted a false affidavit under oath.

The district court noted that, under normal circumstances, it would be inconsistent to decrease a defendant's total offense level for acceptance of responsibility when an attempt to obstruct justice is involved. The court, however, still gave Zambrano the benefit of a two-level offense reduction.

After applying the enhancements and downward adjustment, the district court calculated Zambrano's total offense level as 40. And based on a criminal history category I, the court determined his advisory Guidelines range to be 292 to 365 months' imprisonment. Zambrano requested a below-Guidelines sentence of 180 months' imprisonment.

The district court further discussed the sentencing factors found in 18 U.S.C. § 3553(a) and the specific circumstances of Zambrano's case. The court found the quantity of methamphetamine involved, the presence of other drugs, the sophistication and scope of the drug operation, and Zambrano's beating of another inmate while awaiting sentencing to be aggravating circumstances favoring a higher sentence. As mitigating factors, the court discussed the absence of firearms; Zambrano's relatively young age; and his lack of criminal history, formal education, and paternal guidance. The court then compared Zambrano's and his coconspirators' cases. Ultimately, it applied a downward variance and sentenced Zambrano to 240 months' imprisonment, a below-Guidelines sentence.

## II. *Discussion*
### A. *Procedural Error*

Zambrano contends that the district court erred in adding a four-level role enhancement and a two-level obstruction enhancement to his base offense level of 36. He alleges that these errors caused the court to miscalculate his advisory Guidelines range. Without the enhancements, he believes that the court would have calculated a total offense level of 33. This total offense level incorporates the two-level downward adjustment for acceptance of responsibility, and Zambrano also assumes

that the government would have moved to reduce his total offense level by one additional level. According to Zambrano, his sentencing range should have been 135 to 168 months' imprisonment.

When reviewing a sentence, we first consider whether a district court has procedurally erred. *United States v. Morales*, 813 F.3d 1058, 1069 (8th Cir. 2016). We review a district court's factual findings for clear error and its legal conclusions regarding the Guidelines de novo. *See United States v. Guzman*, 926 F.3d 991, 1000 (8th Cir. 2019) (role enhancement); *United States v. Sandoval-Sianuqui*, 632 F.3d 438, 442 (8th Cir. 2011) (obstruction-of-justice enhancement).

To obtain a sentencing enhancement, the government must prove by a preponderance of the evidence that the increased sentence is warranted. *See United States v. Vasquez-Rubio*, 296 F.3d 726, 729 (8th Cir. 2002) (role enhancement); *United States v. Walker*, 688 F.3d 416, 425 (8th Cir. 2012) (obstruction-of-justice enhancement). "In determining whether the [g]overnment has met its burden, the district court may accept any undisputed portion of the PSR as a finding of fact. Unless a defendant objects to a specific factual allegation contained in the PSR, the court may accept that fact as true for sentencing purposes." *United States v. Fennell*, 780 F. App'x 378, 379 (8th Cir. 2019) (per curiam) (quoting *United States v. Razo-Guerra*, 534 F.3d 970, 975 (8th Cir. 2008)).

1. *Role Enhancement*

First, Zambrano contends that his phone conversation with Cervantes supports his view that he held an inferior rank within the drug conspiracy. *See* PSR at 8, ¶ 28. In paragraph 28 of the PSR, he points out that Cervantes had instructed him to request a lower price during a drug transaction. Receiving this direction from Cervantes, he argues, demonstrates that he followed commands from others.

Zambrano also claims, "At the sentencing, [he] presented evidence through counsel regarding a phone conversation that is referenced in the PSR. Said conversation is an example of activity that is against the notion that [he] had a leadership role in this enterprise." Appellant's Br. at 12 (citation omitted). That specific conversation is discussed in paragraph 67 of the PSR. In text messages sent to the unidentified man in the Memphis area, Zambrano expressed that law enforcement was following his vehicle in California. Before abandoning his vehicle and the 3.8 kilograms of methamphetamine inside, he asserts that he had to call and ask someone about how to handle the matter. This act, he contends, is inconsistent with a leadership role.

The government argues that "[s]everal facts in the PSR support the district court's finding that Zambrano directed others during the conspiracy." Appellee's Br. at 16. It further claims that Zambrano's "authority to set prices for the controlled substances" also establishes his leadership role. *Id.*

In applying U.S.S.G. § 3B1.1(a), a district court increases a defendant's offense level by four if that "defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." "[T]he defendant must have been the organizer [or] leader . . . of one or more other participants." U.S.S.G. § 3B1.1 cmt. n.2.

A district court should consider various factors when deciding if a role enhancement is applicable. These factors include: "the exercise of decision making authority, the nature of participation in the commission of the offense, . . . the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *United States v. Garcia*, 512 F.3d 1004, 1005 (8th Cir. 2008) (quoting U.S.S.G. § 3B1.1 cmt. n.4).

Zambrano does not contest whether five or more participants were involved in the drug conspiracy; he only disputes whether his conduct exemplified leadership status. *See* U.S.S.G. § 3B1.1 cmt. n.2. Zambrano's argument lacks merit.

The district court looked at the offense conduct as a whole. The court found that Zambrano and Cervantes had formed an effective partnership and mutually benefitted from their drug trafficking in Northwest Arkansas. It, however, highlighted the undisputed facts in the PSR that showed Zambrano had exercised control over or directed Cervantes during various drug transactions. The court first stated, "There are many . . . unobjected-to, factual instances where Mr. Cervantes is acting at Mr. Zambrano's direction." Sent'g Tr. at 31, *United States v. Zambrano*, No. 5:18-cr-50038-TLB-1 (W.D. Ark. May 6, 2019), ECF No. 326.

> [Cervantes] ma[de] deliveries to Mr. Howard, referred to as "Michael" in the presentence report. They use[d] [Cervantes's] apartment as a place to package marijuana [for transport to the unidentified man in the Memphis area]. [Cervantes was] used as a go-between with Victor Sanchez-Hernandez. Just, there's just many other instances and references in the presentence report to the point that the Court distinctly draws the conclusion that Paragraph 28 is an outlier.

*Id.* at 32. Additionally, the PSR states that Cervantes collected money on Zambrano's behalf. Using the plea agreement and PSR, the district court concluded that Zambrano demonstrated a sufficient "degree of control and authority exercised over" Cervantes and a sufficient "degree of participation in planning" and furthering the conspiracy to justify a role enhancement. *See United States v. Lopez*, 497 F. App'x 687, 691 (8th Cir. 2013) (per curiam) (internal quotations omitted).

Zambrano bought drugs for the conspiracy, including the 3.8 kilograms of methamphetamine obtained in California; negotiated and set prices for the drugs; and

engaged in an extensive drug network that spanned Arkansas, Arizona, California, Ohio, Tennessee, and Mexico. These acts reflect significant authority and high-level participation in an expansive drug operation.

The district court further highlighted:

> With regard to [Zambrano's argument] about Mr. Zambrano making a phone call after he abandoned 3.8 kilograms of methamphetamine, the street value of which was probably six figures, the Court would expect Mr. Zambrano to be making some phone calls. And we don't have a lot of information about who it was, but to suggest that there's anything unusual about Mr. Zambrano needing to make some phone calls to account for having abandoned and not having paid for, at least not at the time, this 3.8 grams—kilograms that were seized doesn't seem to be anything unusual about that.

Sent'g Tr. at 32. We conclude that the district court did not err in applying the four-level role enhancement under U.S.S.G. § 3B1.1(a).

### 2. *Obstruction-of-Justice Enhancement*

Second, Zambrano argues that the simple act of writing a letter to the district court asserting Flores's innocence does not constitute "obstruction of justice" as defined in 18 U.S.C. § 1503.[3] The government responds that Zambrano's affidavit

---

[3] 18 U.S.C. § 1503(a) provides:

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to

-12-

obstructed Flores's prosecution because it was dated a month before Flores's plea hearing, delivered to her counsel before entry of her guilty plea, and contained a false statement that she was innocent.

U.S.S.G. § 3C1.1 provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

"We give great deference to a district court's decision to impose an obstruction of justice enhancement, reversing only when the district court's findings are insufficient." *Walker*, 688 F.3d at 425 (internal quotation omitted).

In *United States v. Scott*, we upheld the imposition of the obstruction enhancement where the defendant was shown to have intimidated a codefendant into signing a false affidavit used to challenge the search warrant obtained and executed on the defendant's home. 448 F.3d 1040, 1042–45 (8th Cir. 2006). And here, we find no error in the district court's finding that Zambrano displayed obstructive conduct warranting the enhancement.

---

by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b).

The district court stated, "In some respects, [Zambrano's] affidavit can be viewed as Mr. Zambrano having a lot of pain in his heart for having placed his girlfriend in a situation where she's being prosecuted and she's looking at jail time." Sent'g Tr. at 22. But the court emphasized that Zambrano submitted a false sworn statement. "[T]he [c]ourt believe[d] that it was submitted to influence and impede [Flores's] prosecution." *Id.* at 23.

The district court also found a conflict between Zambrano's affidavit and his Mirandized statement given after his arrest. Zambrano's affidavit stated that Flores did not know anything about his drug-related activities; whereas, his Mirandized statement explained that Flores knew they were traveling to California to purchase *marijuana*—not that she did not know anything. The court reasonably considered Zambrano's Mirandized statement and Flores's eventual guilty plea as evidence of Zambrano's attempt to deceive the court. The court also considered the timing of Zambrano's affidavit; he submitted the affidavit prior to Flores's guilty plea. Consistent with U.S.S.G. § 3C1.1 cmt. n.4(C), (F),[4] the court applied the enhancement and properly concluded that Zambrano's affidavit was an attempt to impede Flores's prosecution.

## B. *Substantive Unreasonableness*

Zambrano asserts that his "age, family history, lack of a criminal history, and lack of education" justify a greater downward variance. Appellant's Br. at 15. This

---

[4]Examples of obstructive conduct include "producing or attempting to produce a false . . . document or record during an official investigation or judicial proceeding," U.S.S.G. § 3C1.1 cmt. n.4(C), and "providing materially false information to a judge or magistrate judge." *Id.* § 3C1.1 cmt. n.4(F). Here, the district court emphasized that application of § 3C1.1 encompassed the specific act of this case, which involved an attempt to obstruct justice. Accordingly, the court chose not to apply a § 2D1.1(b)(16)(D) enhancement as recommended by the PSR.

argument suggests that the district court did not properly weigh these factors in its § 3553(a) balancing analysis. The government argues that the court considered Zambrano's mitigating circumstances but placed greater weight on the aggravating factors.

"[A]bsent significant procedural error, we review [a] sentence for substantive reasonableness" under an abuse-of-discretion standard. *United States v. Frausto*, 636 F.3d 992, 995 (8th Cir. 2011) (internal quotation omitted). "A district court abuses its discretion when it fails to consider a relevant factor, gives significant weight to an irrelevant or improper factor, or considers only appropriate factors but . . . commits a clear error of judgment . . . ." *Id.* at 996–97 (internal quotation omitted). "A district court has substantial discretion in determining how to weigh the § 3553(a) factors." *United States v. Morais*, 670 F.3d 889, 893 (8th Cir. 2012). Significantly, "it is nearly inconceivable that a sentence is so high as to be substantively unreasonable and constitute an abuse of discretion when the district court imposed a below-Guidelines sentence." *United States v. Bevins*, 848 F.3d 835, 841 (8th Cir. 2017) (internal quotation omitted).

We are not persuaded by Zambrano's argument. The district court identified the following aggravating factors: the various drugs and amounts involved in the conspiracy; the geographical scope, sophistication, and length of the operation; and Zambrano's jail misconduct while awaiting sentencing. *See* Sent'g Tr. at 60–63. Zambrano also laughed about an overdose and death that occurred during the conspiracy. *See* PSR at 13, ¶ 60a, b. These factors relate to the nature and specifics of the offense, and the court also expressed concern for Zambrano's respect for the law.

As mitigating, the district court discussed Zambrano's young age, absent father, minimal education, and lack of criminal history. *See* Sent'g Tr. at 63–66. The court emphasized Zambrano's first-time offender status and even considered how his

-15-

experimental drug use could have influenced his poor choices. Based on these factors and the sentences imposed on Zambrano's coconspirators, the court varied downward 52 months. It was not required to do more. This is not "the unusual case" where we will reverse Zambrano's "sentence . . . as substantively unreasonable." *United States v. Feemster*, 572 F.3d 455, 464 (8th Cir. 2009) (en banc) (internal quotation omitted).

### III. *Conclusion*

Therefore, we affirm the district court's judgment.

_____