# United States Court of Appeals

## For the Eighth Circuit

_____

No. 21-3524

_____

United States of America

*Plaintiff - Appellee*

v.

Jaime Ignacio Campos

*Defendant - Appellant*

_____

No. 21-3646

_____

United States of America

*Plaintiff - Appellee*

v.

Tony Renaldo Watson, Jr.

*Defendant - Appellant*

_____

No. 21-3677

_____

United States of America

*Plaintiff - Appellee*

v.

Alessandra Katie Stamps, also known as Brazil

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Central

_____

Submitted: September 22, 2022
Filed: August 15, 2023

_____

Before SMITH, Chief Judge, KELLY and GRASZ, Circuit Judges.

_____

KELLY, Circuit Judge.

Jaime Campos, Tony Watson, Jr., and Alessandra Stamps pleaded guilty to federal controlled substance offenses, and all three appeal their sentences. After careful review, we vacate each defendant's sentence and remand for resentencing.

I.

Law enforcement began investigating Stamps in August 2020 after learning from a confidential informant that Stamps was dealing large quantities of methamphetamine in the Des Moines, Iowa, area. Police arranged several controlled buys from Stamps over the next few months using the confidential informant and later an undercover officer. Stamps contacted the undercover officer in early January 2021 to arrange another drug purchase, and on the morning of January 7, the undercover officer called Stamps and agreed to buy eight ounces of methamphetamine.

After arranging the sale, Stamps drove to a motel in Urbandale, Iowa, to meet with Campos and Watson, who had traveled together to Iowa from Texas to supply Stamps with methamphetamine. Campos and Watson were sharing a room at the motel, and after Stamps arrived, the two met with her and provided her with the methamphetamine she planned to sell to the undercover officer.

The undercover officer arranged for the purchase to take place in the parking lot of a nearby hardware store, and Stamps drove to that location around midday with Campos in the passenger seat. After the undercover officer arrived, Stamps entered the officer's car and handed him the agreed-upon quantity of methamphetamine. Police subsequently arrested Stamps and Campos. Watson, who had left the motel in a separate car, was pulled over by law enforcement and arrested roughly 20 minutes later. Police then obtained and executed a search warrant for Campos's and Watson's motel room. During the search, officers found methamphetamine, cocaine, marijuana, pills containing controlled substances, a scale, packaging materials with drug residue, and a loaded handgun.

On January 21, 2021, a grand jury returned a five-count indictment charging Campos, Watson, and Stamps with one count of conspiracy to distribute methamphetamine (Count 1); Stamps with two counts of distribution of methamphetamine (Counts 2 and 3); and Campos and Watson with one count of possession with intent to distribute methamphetamine (Count 4) and one count of possession with intent to distribute cocaine (Count 5). Campos and Watson both pleaded guilty to Count 4, see 21 U.S.C. § 841(a)(1), (b)(1)(A), and Stamps pleaded guilty to Count 3, see id.

At sentencing, the district court determined that both Campos and Watson qualified for a career-offender enhancement based on their prior convictions for "controlled substance offenses" under Texas Health & Safety Code § 481.112. See United States Sentencing Guidelines §§ 4B1.1(a), 4B1.2(b) (2021). The resulting advisory Guidelines range for each was 262 to 327 months of imprisonment. As to Campos, the district court granted a "modest" downward variance and sentenced

-3-

him to 240 months of imprisonment. As to Watson, the district court granted the government's motion for a downward departure, separately imposed a downward variance, and sentenced him to 190 months of imprisonment. Stamps received a sentence of 300 months after the district court overruled her objection to two sentencing enhancements and granted her a downward variance from her advisory Guidelines range of 360 months to life.

Campos, Watson, and Stamps appeal their sentences.

## II.

When reviewing a sentence, "we first determine whether the district court committed a significant procedural error." United States v. Ross, 29 F.4th 1003, 1007 (8th Cir. 2022). Such errors include "an improperly determined Guidelines range." United States v. McGrew, 846 F.3d 277, 280 (8th Cir. 2017). We review the district court's construction and application of the Guidelines de novo and its factual findings for clear error, "keeping in mind that the Government must prove by a preponderance of the evidence each of the facts necessary to establish a sentencing enhancement." United States v. Guzman, 926 F.3d 991, 1000 (8th Cir. 2019) (cleaned up) (quoting United States v. Razo-Guerra, 534 F.3d 970, 975 (8th Cir. 2008)). In the absence of procedural error, we then consider "the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." Ross, 29 F.4th at 1008 (8th Cir. 2022) (quoting United States v. Feemster, 572 F.3d 455, 461 (8th Cir. 2009) (en banc)).

We address each appeal in turn.

## A.

Campos challenges his designation as a career offender under the Guidelines. A defendant qualifies for a sentencing enhancement as a career offender if, among other things, he "has at least two prior felony convictions of either a crime of

-4-

violence or a controlled substance offense." USSG § 4B1.1(a). The district court concluded that two of Campos's prior Texas convictions qualified as predicate "controlled substance offenses." The Guidelines define a "controlled substance offense" in relevant part as any federal or state offense "punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance." Id. § 4B1.2(b). And the commentary to § 4B1.2 further provides that a "controlled substance offense" includes "the offenses of aiding and abetting, conspiring, and attempting to commit such [an] offense[]."[1] Id. § 4B1.2, comment. (n.1). Campos contends that his two prior Texas convictions do not qualify as "controlled substance offenses" under this definition, which is a question we review de novo. See United States v. Williams, 926 F.3d 966, 969 (8th Cir. 2019).

To determine whether a prior state conviction qualifies as a "controlled substance offense" for purposes of the career-offender enhancement, we apply a "categorical approach." Id. Based on the statutory elements only, we must decide whether the "state statute defining the crime of conviction categorically fits within the generic federal definition of a corresponding controlled substance offense." United States v. Maldonado, 864 F.3d 893, 897 (8th Cir. 2017) (cleaned up) (quoting United States v. Roblero-Ramirez, 716 F.3d 1122, 1125 (8th Cir. 2013)); see Williams, 926 F.3d at 969 ("[W]e look to the elements of the crime of conviction rather than how a particular defendant might have committed the offense."). That is, "we must presume" that a defendant's prior conviction "rested upon nothing more

---

[1] Campos asserts in his reply brief that the commentary providing that a "controlled substance offense" includes inchoate offenses, see USSG § 4B1.2, comment. (n.1), is "not entitled to deference" and is therefore inapplicable here. This argument is foreclosed by our precedent. See United States v. Merritt, 934 F.3d 809, 811 (8th Cir. 2019); see also United States v. Garcia, 946 F.3d 413, 417 (8th Cir. 2019) ("[O]ur court has previously recognized that this commentary is a reasonable interpretation of the career offender guidelines . . . ." (cleaned up)). And in any event, we need not consider the argument because Campos did not raise it in his opening brief. See United States v. Ladeaux, 61 F.4th 582, 587 (8th Cir. 2023).

than the least of the acts proscribed by the state law" in question, and then determine "whether even those acts are encompassed by" the Guidelines definition of a "controlled substance offense." Maldonado, 864 F.3d at 897 (quoting Roblero-Ramirez, 716 F.3d at 1125); see United States v. Castellanos Muratella, 956 F.3d 541, 543 (8th Cir. 2020) ("To qualify as a predicate offense, [a state statute] must not criminalize more than the guidelines definition of 'controlled substance offense.'" (cleaned up)).

Campos's two Texas convictions were for violations of Texas Health and Safety Code § 481.112, which provides in relevant part that "a person commits an offense if the person knowingly manufactures, delivers, or possesses with intent to deliver a controlled substance." Tex. Health & Safety Code § 481.112(a).[2] "Manufacture," "[d]eliver," and "[p]ossession" are defined in a separate section. See id. § 481.002. And as is relevant here, "[d]eliver" means "to transfer, actually or constructively, to another a controlled substance" and "includes offering to sell a controlled substance." Id. § 481.002(8).

Because § 481.112(a) proscribes "manufactur[ing]," "deliver[ing]," or "possess[ing] with intent to deliver" a controlled substance, the first step in our analysis ordinarily would be to determine whether these "alternative methods of committing the offense" are elements that define separate crimes, or whether § 481.112(a) instead "merely 'specifies various *means* of fulfilling the crime's elements.'" United States v. Harris, 950 F.3d 1015, 1017 (8th Cir. 2020) (quoting

---

[2]This court has previously held that a conviction under Texas Health and Safety Code § 481.112(a) qualifies as a "serious drug offense" under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). See United States v. Block, 935 F.3d 655, 656–57 (8th Cir. 2019) (per curiam). But the ACCA's definition of a "serious drug offense" is broader than the Guidelines definition of a "controlled substance offense." See United States v. Bynum, 669 F.3d 880, 886 (8th Cir. 2012) ("We similarly reject . . . [the] argument that the ACCA's definition of 'serious drug offense' should be interpreted narrowly to conform to the sentencing guidelines' definition[] of 'controlled substance offense' . . . ."); see also USSG § 4B1.4, comment. (n.1). And the Guidelines definition is what is at issue here.

-6-

United States v. Doyal, 894 F.3d 974, 975 (8th Cir. 2018)); see Mathis v. United States, 579 U.S. 500, 504–06 (2016) (describing the distinction between elements and means). Texas's highest criminal court has "definitively answer[ed]" this means-versus-elements question, however. Mathis, 579 U.S. at 517; see United States v. Fisher, 25 F.4th 1080, 1084 (8th Cir. 2022) ("When making the means-or-elements determination, we may consider authoritative state court decisions."). In Lopez v. State, the Texas Court of Criminal Appeals explained that § 481.112

> provides *several different means* for committing the offense of delivery of a single quantity of drugs so that, no matter where along the line of actual delivery—from the offer to sell, to the possession of the drugs with the intent to deliver them, to the actual delivery itself—the drug dealer may be held accountable for the gravamen of the offense—the distribution of dangerous drugs in our society.

108 S.W.3d 293, 299–300 (Tex. Crim. App. 2003) (emphasis added); see id. at 297 ("[T]here are at least five ways to commit an offense under [§] 481.112 . . . ."). Because § 481.112(a) is an indivisible statute that "sets forth alternative factual means to commit a single offense,"[3] Fisher, 25 F.4th at 1083, we must consider the provision's full reach and determine whether a defendant could be convicted under the statute "for conduct that does not fit within" the Guidelines definition of a "controlled substance offense." Maldonado, 864 F.3d at 899.

Campos argues that § 481.112(a) is categorically broader than the Guidelines definition because the statute criminalizes a mere "offer[] to sell" a controlled substance. See United States v. Thomas, 886 F.3d 1274, 1276 (8th Cir. 2018) ("[T]o meet the Guidelines definition, a state law must require something more than a mere offer to sell."). The government contends in response that any such "offer to sell" is simply "an attempt to commit a controlled substance offense," which is

---

[3]Campos agrees that § 481.112(a) is indivisible, and the government does not argue to the contrary. Accord United States v. Tanksley, 848 F.3d 347, 352 (5th Cir. 2017) ("Section 481.112(a) is an indivisible statute . . . .").

encompassed by the Guidelines definition. See USSG § 4B1.2, comment. (n.1). The central question here, then, is whether a conviction under § 481.112(a) for offering to sell a controlled substance invariably requires conduct that is equivalent to an attempt to distribute or dispense a controlled substance. See USSG § 4B1.2(b).[4]

To be guilty of an attempted crime, a defendant must have (1) "intended to commit the predicate offense" and (2) engaged in conduct "that constitutes a substantial step towards the crime's commission." United States v. Kempter, 29 F.4th 960, 965 (8th Cir. 2022); see United States v. Ross, 613 F.3d 805, 809 (8th Cir. 2010) ("[W]e expect that the Sentencing Commission meant to adopt a 'generic, contemporary meaning' of 'attempt' in its commentary."). An offer to sell drugs under § 481.112(a) is therefore a categorical match to attempted distribution or dispensing under USSG § 4B1.2(b) only if an offer-to-sell conviction necessarily requires that a defendant (1) intended to distribute or dispense drugs and (2) took a substantial step toward that end, but did not complete the intended transfer.

Under Texas law, "[t]he elements of the offense of delivery of a controlled substance"—which includes an "offer[] to sell"—are "(1) a person (2) knowingly or intentionally (3) delivers (4) a controlled substance." Young v. State, 183 S.W.3d 699, 706 (Tex. App. 2005) (citing Stewart v. State, 718 S.W.2d 286, 288 (Tex. Crim. App. 1986)); see Knight v. State, 91 S.W.3d 418, 423 (Tex. App. 2002) ("To prove an offer-to-sell case, the State must prove that the defendant intentionally or knowingly offered to sell a controlled substance."). The Texas Court of Criminal Appeals has made clear that § 481.112(a) includes offers to sell where a defendant intended to complete a drug transfer but fell short of doing so. See Lopez, 108

---

[4]Under § 481.112(a), an "offer[] to sell" is treated as a "deliver[y]" of a controlled substance. See Tex. Health & Safety Code § 481.002(8). We recognize that the term "delivery" does not appear in USSG § 4B1.2(b), but we naturally construe the government's argument to be that an offer-to-sell offense under § 481.112(a) is equivalent to an attempt to "distribut[e]" or "dispens[e]" a controlled substance rather than an attempt to "manufacture, import, [or] export" one. USSG § 4B1.2(b).

S.W.3d at 300 ("Under [§] 481.112, the fact that a [drug] transfer is thwarted will not negate conviction for delivery of that drug."); see also Francis v. State, 890 S.W.2d 510, 513 (Tex. App. 1994) (affirming an offer-to-sell conviction where the defendant "was stopped short of his intended purpose of an actual delivery"). In other words, the statute criminalizes conduct that would constitute attempted distribution or dispensing of a controlled substance under the Guidelines.

But the crucial inquiry here is whether an offer-to-sell conviction under § 481.112(a) always requires that a defendant, in fact, intended to complete a drug transfer.[5] See Kempter, 29 F.4th at 965 (explaining that attempt liability "requires proof that the defendant intended to commit the predicate offense"); United States v. Bennett, 972 F.3d 966, 976 (8th Cir. 2020) ("Under the categorical approach, the gap between 'many' [cases] and 'all' [cases] is determinative."). And a thorough review of Texas case law confirms that such intent is not a required element of an offer-to-sell offense.

In Stewart v. State, a defendant was convicted of "delivery of a controlled substance by offer to sell" after he sold undercover police officers a "hundred dollar bag" of heroin that was counterfeit. 718 S.W.2d at 287. The defendant appealed, arguing that the evidence was not sufficient to support his conviction because what he offered to sell was not actually a controlled substance. In affirming the defendant's conviction, the Texas Court of Criminal Appeals explained that an offer-to-sell offense does not require an actual transfer of drugs, nor does a defendant even need to have any controlled substances on hand. Id. at 288; see id. at 289 ("[T]he presence or possession of any substance is not necessary to the offense."). Rather, "[t]he offense is complete when, by words or deed, a person knowingly or

_____

[5]We assume for purposes of our analysis here that any act that would qualify under Texas law as an "offer[] to sell a controlled substance" satisfies the substantial-step requirement for an attempted distribution or attempted dispensing offense under the Guidelines. See Kempter, 29 F.4th at 965 (noting that a conviction for an attempted crime requires that the defendant take "a substantial step towards the crime's commission").

-9-

intentionally *offers* to sell what he states is a controlled substance." Id. at 288. Thus, under this formulation, whether a defendant possessed a controlled substance, had access to a controlled substance, or—as is relevant here—actually intended to distribute a controlled substance is not essential to an offer-to-sell conviction. See id. at 289 ("In the instant case the offense was complete when appellant stated that he had a hundred dollar bag of heroin to sell.").

Subsequent decisions by intermediate Texas courts have reiterated that an offer-to-sell offense under § 481.112(a) is committed as soon as a verbal offer is made, and seemingly irrespective of a defendant's intent to complete a drug transfer. See Iniguez v. State, 835 S.W.2d 167, 171 (Tex. App. 1992) (explaining that "the offense of delivery by offer to sell is complete by the mere utterance of the words or deeds constituting the offer" and affirming the defendant's offer-to-sell conviction even though the defendant's delivery of rice and flour rather than cocaine suggested that he "intended to sell a simulated controlled substance"); Vivanco v. State, 825 S.W.2d 187, 190–91 (Tex. App. 1992) (noting that "[t]he offense of delivery by offer to sell is complete when the [defendant] makes his offer" and affirming a defendant's conviction for offering to sell at least 400 grams of cocaine without addressing whether he actually intended to deliver that amount). And at least one court has expressly stated that "intent to actually sell a controlled substance is not required for the offense of delivery by offer to sell." Wiltz v. State, No. B14-92-263-CR, 1994 WL 468432, at *8 (Tex. App. Sept. 1, 1994).

Indeed, some Texas defendants have been convicted of offering to sell a controlled substance despite having had no intention of completing any sort of drug transfer at all. In one case, for instance, a defendant was convicted of an offer to sell after telling a drug dealer over the phone that he could supply her with a large quantity of cocaine. See Henderson v. State, No. 03-96-446-CR, 1998 WL 53967, at *6 (Tex. App. Feb. 12, 1998). The defendant claimed that the "sole reason" he made such an offer was because he actually "planned to rob" the drug dealer of her purchase money. Id. at *2. And when the defendant met with the drug dealer, he brought along a "package" that was made to "look like drugs" so that the drug dealer

-10-

"would think he . . . had the cocaine." Id. at *3. The defendant's conduct, in short, indicated that he at no point intended to complete a drug transaction. Yet the Texas Court of Appeals affirmed the defendant's offer-to-sell conviction, concluding that the defendant had committed the offense when he "called [the drug dealer] and told her that he . . . had the two kilos of cocaine she requested." Id. at *6.

In another offer-to-sell case, the prosecution argued at trial that the defendant "intended to 'rip off'" an undercover officer rather than "actually sell him cocaine." Wiltz, 1994 WL 468432, at *7. The Texas Court of Appeals nonetheless affirmed the defendant's conviction on appeal after explaining that an offer-to-sell offense does not require that the defendant "intended to actually transfer a drug." Id. at *8. And Texas courts have similarly affirmed offer-to-sell convictions in other cases without addressing whether the defendant intended to complete a drug transaction, and where such intent could not be easily inferred from the circumstances of the offense. See, e.g., Thompson v. State, No. A14-93-52-CR, 1993 WL 471313, at *1–2 (Tex. App. Nov. 18, 1993) (concluding that a defendant's conversations with an undercover officer about a proposed cocaine sale were sufficient to sustain an offer-to-sell conviction even though "no cocaine was ever delivered" or even presented to the undercover officer); Hall v. State, No. 14-96-989-CR, 1998 WL 78112, at *2 (Tex. App. Feb. 26, 1998) (affirming an offer-to-sell conviction where a defendant merely told undercover officers in a parking lot that she could get them a rock of crack cocaine if they first "gave her some money or a ride to where she could get one"); Mole v. State, No. 01-99-496-CR, 2000 WL 125028, at *2 (Tex. App. Feb. 3, 2000) (affirming an offer-to-sell conviction without addressing the defendant's argument that he "never intended to actually deliver cocaine"); cf. Rodriguez v. State, 879 S.W.2d 283, 284, 286 (Tex. App. 1994) (agreeing that a defendant "was subject to prosecution" for offering to sell a controlled substance even though the defendant attempted to deceive his purchasers by selling them "numerous brick-shaped packages" containing flour).

In sum, Texas case law indicates that a defendant can be convicted of "offering to sell a controlled substance" under § 481.112(a) without having the intent

to distribute or dispense drugs.[6]  An offer-to-sell conviction is thus categorically broader than an attempt to commit a "controlled substance offense" under the Guidelines.  See Kempter, 29 F.4th at 965.  Accordingly, Campos's two prior convictions under § 481.112 do not qualify as predicate "controlled substance offenses" for purposes of the career-offender enhancement.  See Castellanos Muratella, 956 F.3d at 543 ("To qualify as a predicate offense, [a state statute] must not criminalize more than the guidelines definition of 'controlled substance offense.'" (cleaned up))

This conclusion is supported by our prior cases.  In United States v. Thomas, for example, we expressly acknowledged that a state law would be categorically broader than the Guidelines definition of a "controlled substance offense" if it criminalized "a mere offer to sell" drugs.  886 F.3d at 1276; see Maldonado, 864 F.3d at 899 (suggesting that a statute criminalizing an "attempted transfer" of a controlled substance was distinct from one criminalizing "offering to sell a controlled substance").  "[T]o meet the Guidelines definition," we explained, a state law "must require something more" than the "mere words of an offer," such as "an

---

[6]As the government notes, the Fifth Circuit held in Ochoa-Salgado v. Garland that an offer-to-sell offense under § 481.112(a) categorically qualifies as an "attempted transfer" of drugs under the federal Controlled Substances Act.  5 F.4th 615, 622 (5th Cir. 2021); see 21 U.S.C. § 802(8), (11).  In reaching that conclusion, the Ochoa-Salgado court stated that "§ 481.112 requires an intent to sell" a controlled substance and that "[t]he only" Texas state court decision to the contrary "employed demonstrably erroneous reasoning."  5 F.4th at 621.  We acknowledge that some Texas court decisions have suggested that § 481.112(a) does not criminalize offers to sell where the defendant merely intended to "defraud [a purchaser] of his money."  Garber v. State, 671 S.W.2d 94, 99 (Tex. App. 1984); see Knight, 91 S.W.3d at 424.  But none of those decisions was issued by Texas's highest criminal court.  Moreover, we are not in a position to decide which Texas courts correctly construed Texas law.  Rather, our task is to determine whether there is a "realistic probability" that a defendant could be convicted of an offer-to-sell offense in Texas "for conduct that would fall outside the generic definition[]" of a "controlled substance offense" under the Guidelines.  Maldonado, 864 F.3d at 900.  And our review of Texas case law confirms that some Texas defendants have, in fact, been convicted for such conduct.

-12-

attempt" or a "bona fide offer showing" a defendant's "intent." Thomas, 886 F.3d at 1276. And after reviewing relevant state decisional law, we concluded that the state statute at issue qualified as a "controlled substance offense" because it only criminalized offers to sells drugs that amounted to "at least an attempt to distribute a controlled substance." Id. at 1277. But as just explained, there is no such categorical equivalency between an offer-to-sell offense under § 481.112(a) and an attempt to distribute under the Guidelines.

Our conclusion also comports with a pre-Ochoa-Salgado line of Fifth Circuit cases holding that convictions under § 481.112 "do[] not qualify as a controlled substance offense under the Guidelines." Tanksley, 848 F.3d at 352; see United States v. Hinkle, 832 F.3d 569, 576 (5th Cir. 2016) (concluding that a defendant's conviction under § 481.112 "for the knowing delivery of heroin is not a controlled substance offense under the Guidelines"); United States v. Price, 516 F.3d 285, 287 (5th Cir. 2008) ("A conviction for delivering a controlled substance under § 481.112(a) . . . covers a broader range of offenses than a 'controlled substance offense' under [the Guidelines]."); see also United States v. Vickers, 540 F.3d 356, 365 (5th Cir. 2008) (observing that an offer-to-sell offense under § 481.112(a) does not require that a defendant "have any drugs to sell or even intend ever to obtain the drugs he is purporting to sell").

Because Campos's prior convictions under § 481.112 do not qualify as controlled substance offenses for purposes of the career-offender enhancement, we vacate his sentence and remand for resentencing.[7]

---

[7]Campos also argues on appeal that a prior robbery conviction does not qualify as a predicate "crime of violence" for purposes of the career-offender enhancement. The district court did not consider this conviction at sentencing. And we need not consider it here either because whether Campos qualifies for the career-offender enhancement rises and falls with whether his two prior drug convictions qualify as predicate "controlled substance offenses." See USSG § 4B1.1(a) (requiring that a defendant have "at least two" qualifying career-offender predicates).

B.

Like Campos, Watson was sentenced as a career offender based on two prior convictions under Texas Health and Safety Code § 481.112. Because we conclude that convictions under this statute do not qualify as predicate "controlled substance offenses" under the Guidelines, we also vacate Watson's sentence and remand for resentencing.

To the extent Watson failed to raise this specific argument to the district court, we review his sentence for plain error. See United States v. Williams, 30 F.4th 796, 799 (8th Cir. 2022); see also Merritt, 934 F.3d at 811 ("To succeed on plain error review, [a defendant] must show (1) an error; (2) that is plain; (3) that affects his substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." (cleaned up)). As explained above, the district court erred in applying the career-offender enhancement to Watson based on state convictions that do not qualify as predicate "controlled substance offenses." That error affected Watson's substantial rights by significantly increasing his advisory Guidelines range, and such an error affects the fairness and integrity of the judicial proceedings here. See United States v. Perez, 46 F.4th 691, 701 (8th Cir. 2022).

The error was also plain. The district court concluded that the career-offender enhancement applied to Watson under "the law of this circuit." But Texas courts have stated that "[t]he offense of delivery by offer to sell is complete when the [defendant] makes his offer." Vivanco, 825 S.W.2d at 190; see Stewart, 718 S.W.2d at 288. And we expressly stated in Thomas that a state law "must require something more than" such "a mere offer to sell" in order to qualify as a "controlled substance offense" under the Guidelines. 886 F.3d at 1276; see United States v. Jefferson, 975 F.3d 700, 707 (8th Cir. 2020) (acknowledging that § 481.112 was distinguishable from a Wisconsin statute criminalizing the "deliver[y]" of a controlled substance because the former "could be violated 'by proving only an offer to sell'" (citing Hinkle, 832 F.3d at 576–77)). At the time of Watson's sentencing, moreover, the Fifth Circuit had clearly held that a conviction under § 481.112 does not qualify as

-14-

a predicate "controlled substance offense." Tanksley, 848 F.3d at 352; see Ochoa-Salgado, 5 F.4th at 618 (recognizing that § 481.112's "offer-to-sell theory does not fit within" the Guidelines definition of a "controlled substance offense" but stating that Fifth Circuit cases concluding the same "d[id] not constrain" the court's interpretation of the Controlled Substances Act); see also United States v. Lovelace, 565 F.3d 1080, 1092 (8th Cir. 2009) (concluding that an error was plain in light of decisions from other circuit courts). Thus, even under the plain-error standard, we conclude that Watson's sentence must be vacated.

C.

Stamps appeals two separate sentencing enhancements. One enhancement provided for a two-level increase to Stamps's base offense level for "engag[ing] in witness intimidation, tamper[ing] with or destroy[ing] evidence, or otherwise obstruct[ing] justice" (the obstruction-of-justice enhancement). USSG § 2D1.1(b)(16)(D). And the other enhancement provided for an additional two-level increase for "us[ing] violence, ma[king] a credible threat to use violence, or direct[ing] the use of violence" in connection with a controlled substance offense (the violent-threat enhancement). Id. § 2D1.1(b)(2).

Both enhancements were based on the same set of allegations in the Presentence Investigation Report (PSR), which described Stamps's alleged efforts to coordinate a "hit" against the undercover officer who purchased methamphetamine from her during the January 7, 2021, controlled buy. Stamps was arrested after the controlled buy and was ordered detained pending trial. According to the PSR, police were contacted a few weeks later by a confidential source (CS) who had shared a cell with Stamps at the local jail for about a week and a half. The CS claimed that Stamps wanted to give the undercover officer's name to two men she knew in Chicago so that they could "get rid of the problem," which the CS understood to mean that Stamps expected the men to have the officer killed. Stamps purportedly told the CS that "[i]f there is no witness, there is no case." And according to the CS, Stamps trusted that the two men "would help her" because they

-15-

"th[ought] of her as a stepmom," and because the men had children in law enforcement who, Stamps believed, could access the undercover officer's personal information. The CS said that Stamps had discussed "selling methamphetamine to make money to pay for 'the hit'" and had spoken with individuals outside of jail about obtaining a gun. Stamps also allegedly asked the CS to mail court documents "with the undercover officer's name circled" to the two men in Chicago, but the CS did not fulfill that request and instead contacted law enforcement. After interviewing the CS, police reviewed recorded phone calls that Stamps had made from jail, which purportedly corroborated parts of the CS's account.

Stamps objected to the paragraphs in the PSR describing this conduct, as well as to the corresponding sentencing enhancements. Stamps claimed that her communications with the two Chicago men, whom she "consider[ed] family," were simply meant to keep them "apprised of what was going on in her case." She also proffered that her phone calls from jail, which she made less than two weeks after her arrest, reflected her efforts to have the men help her retain legal counsel. At sentencing, Stamps offered evidence of the CS's criminal history. She argued that the CS's "far-fetched account" of Stamps's alleged attempt "to coordinate and execute a murder-for-hire plot" was "not credible" because the CS had shared that information with law enforcement in the hope of receiving a benefit "in her own pending criminal proceedings."[8]

In support of both enhancements, the government argued that the "facts" in the PSR regarding the alleged hit were supported by the CS's statements to law enforcement, which were summarized in two interview reports. The first of those reports was prepared by the undercover officer, who interviewed the CS on January 28, 2021. And the second report was prepared by an FBI agent who

---

[8]Stamps's exhibits indicated that the CS was awaiting sentencing in Iowa state court for "second-degree theft with a habitual offender enhancement" at the time the CS spoke with law enforcement.

interviewed the CS four days later.[9]  The government also relied on a list of excerpts from Stamps's phone calls from jail that, according to the government, "further corroborated" the CS's statements.  The two interview reports and the phone call excerpts were introduced as sentencing exhibits.

At the sentencing hearing, the government did not call any witnesses.  Relying solely on the parties' sentencing memoranda and exhibits, the district court overruled Stamps's objections and stated the following in relevant part:

> First of all, the Court makes these [sentencing enhancement] determinations . . . by a preponderance of the evidence.  It's a lower standard tha[n] if we were going to trial and we were deciding something beyond a reasonable doubt, and the record that I have available to me I think reasonably supports the allegations with regard to [the] threat of violence [to the undercover officer] and the enhancement for obstructing justice . . . . I do find that those enhancements [under USSG § 2D1.1(b)(2) and (b)(16)(D)] are appropriately provided in the [PSR].

With the two enhancements, Stamps's advisory Guidelines range was 360 months to life.

On appeal, Stamps argues that the hearsay statements from the CS were "insufficiently reliable to constitute a basis for" the obstruction-of-justice and violent-threat enhancements.  See USSG § 2D1.1(b)(2), (b)(16)(D).  She also contends that, even accepting those hearsay statements as true, "they d[id] not implicate conduct that falls within the plain language of either" enhancement.

---

[9]Both reports were prepared after these interview dates.  The FBI agent's report was prepared on March 11, 2021, more than a month after his interview with the CS.  And the undercover officer's report was prepared on April 1, 2021, more than two months after his interview with the CS.

At sentencing, a district court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, including hearsay and double hearsay," so long as that information has "sufficient indicia of reliability to support its probable accuracy." United States v. Harris, 44 F.4th 819, 822 (8th Cir. 2022) (quoting USSG § 6A1.3(a)). The reliability of hearsay evidence can depend on "the consistency of the hearsay testimony, the timing and nature of the declarant's statements, and the witness's impressions of the declarant's demeanor, as well as other corroborating evidence." United States v. Sheridan, 859 F.3d 579, 583 (8th Cir. 2017). And whether such evidence is sufficiently reliable is "a determination 'committed to the sound discretion of the district court.'" United States v. Wailes, 44 F.4th 823, 826 (8th Cir. 2022) (quoting United States v. Woods, 596 F.3d 445, 448 (8th Cir. 2010)).

Here, Stamps objected to the factual assertions in the PSR that formed the basis for both sentencing enhancements. One of Stamps's primary arguments was that the CS had a strong motive to offer seemingly helpful information to law enforcement. Stamps provided the district court with a record of the CS's criminal history to support her theory that the CS fabricated the story of the alleged hit. Yet because neither the CS nor the two officers who interviewed the CS testified at Stamps's sentencing hearing, the district court had no basis for assessing whether Stamps's theory was true. Cf. United States v. Sykes, 854 F.3d 457, 460–61 (8th Cir. 2017) (affirming the application of a violent-threat enhancement under USSG § 2D1.1(b)(2) based on a detective's testimony at sentencing "as to three threatening or violent incidents" involving the defendant that a confidential source "reported to" the detective). Indeed, the only evidence the district court had before it was the two written reports, which summarized interviews between the CS and law enforcement officers that were conducted several weeks before the reports were prepared.[10] See

---

[10]The interview reports themselves amounted to double hearsay, as they were out-of-court statements made by law enforcement officers who were in turn summarizing what the CS purportedly told them. And the threatening language attributed to Stamps in the reports (e.g., "If there is no witness, there is no case") amounted to triple hearsay, as those statements were purportedly made to the CS,

-18-

United States v. Timmons, 950 F.3d 1047, 1051 (8th Cir. 2020) ("[U]nsworn and oral statements to the police are the least reliable type of hearsay." (cleaned up)).

The government contends that the excerpts from Stamps's recorded phone calls from jail "tended to corroborate" the CS's statements to police. But even if those excerpts corroborated some details of the CS's account, none corroborated the CS's ultimate conclusion that Stamps sought to "get rid of" the undercover officer by arranging a hit against him. The government also made no effort at sentencing to bolster the reliability of the CS's hearsay statements. See United States v. Berrier, 28 F.4th 883, 887 (8th Cir. 2022) (noting that the government bears the burden of proving that hearsay evidence has "sufficient indicia of reliability"). The district court heard no testimony about the CS's demeanor during her interviews with law enforcement, or why the interviewing officers presumably found the CS's account believable. Cf. Sheridan, 859 F.3d at 584 (concluding that hearsay evidence was sufficiently reliable in part because a detective had "observe[d]" the declarant's "demeanor" and later "describ[ed] that demeanor to the district court" while testifying at a sentencing hearing). And because the interviewing officers did not testify, the district court was also unable to assess the officers' credibility, or the accuracy of their perceptions as reflected in the written interview reports. Cf. Woods, 596 F.3d at 448 (noting that this court gives great deference to a district court's "assessment of a *witness's* credibility" (emphasis added)).

When factual allegations in a PSR are contested, "the government must present evidence at the sentencing hearing to prove the existence of the disputed facts." United States v. Poor Bear, 359 F.3d 1038, 1041 (8th Cir. 2004). Yet rather than presenting evidence at sentencing to prove that Stamps orchestrated a hit against the undercover officer, the government here merely established where the contested allegations regarding the hit came from—namely, two written interview reports summarizing the CS's statements to law enforcement. Under these circumstances,

who then shared them with the interviewing officers, who then recorded them in interview reports that were admitted as out-of-court statements at Stamps's sentencing hearing.

the district court had no opportunity to make a credibility determination as to whose account—the CS's (as reflected in the interview reports) or Stamps's—was more believable.  See United States v. Richey, 758 F.3d 999, 1002 (8th Cir. 2014) ("If the sentencing court chooses to make a finding with respect to any disputed facts, it must do so on the basis of evidence . . . ." (cleaned up)).  We are also without an explanation from the district court as to why it believed "the record . . . reasonably support[ed]" the two sentencing enhancements it imposed, or why it found the government's arguments more persuasive.  See United States v. Guarino, 517 F.3d 1067, 1069 (8th Cir. 2008) ("[I]t is imperative that district courts provide an adequate explanation of their sentencing decisions so this court can ensure there is no significant procedural error.").

The government bears the burden of proving "the facts necessary to establish a sentencing enhancement" by a preponderance of the evidence.  Guzman, 926 F.3d at 1000 (quoting Razo-Guerra, 534 F.3d at 975).  After careful consideration of the record here, we conclude that, once Stamps objected to the factual recitation in the PSR, the government failed to meet its burden as to both the obstruction-of-justice and the violent-threat enhancements.[11]  We therefore vacate Stamps's sentence, remand for resentencing without the two disputed enhancements, and order that resentencing be based on the existing record.  See United States v. Thomas, 630 F.3d 1055, 1057 (8th Cir. 2011) (per curiam) ("[W]e conclude that the Government had

_____

[11]The district court erred in applying the obstruction-of-justice enhancement for an alternative reason as well.  Even crediting the CS's statements regarding the alleged hit, the record does not show that Stamps in fact intimidated the undercover officer, or that the alleged plot obstructed the government's prosecution or investigation of Stamps's case in any way.  At most, the sentencing record suggests that Stamps *attempted* to intimidate the undercover officer or to otherwise obstruct justice.  But unlike other Guidelines provisions, § 2D1.1(b)(16)(D)'s plain language does not encompass attempts.  See, e.g., USSG § 3C1.1 (providing in relevant part for a two-level enhancement if the defendant "willfully obstructed or impeded, *or attempted to obstruct or impede*, the administration of justice with respect to the investigation, prosecution, or sentencing of the instance offense of conviction" (emphasis added)).

a full and fair opportunity to present its evidence [at sentencing] and that we should follow the traditional path of limiting the Government to one bite at the apple." (cleaned up)).

## III.

We vacate the defendants' sentences and remand to the district court for resentencing.

GRASZ, Circuit Judge, dissenting.

I respectfully dissent from the court's decision to vacate the sentences of the three appellants.

I begin where the court's analysis ends—the application of two enhancements to Stamps's offense level because of her purported efforts to coordinate a "hit" against the undercover officer who purchased methamphetamine from her in a controlled buy. The court holds the government failed to meet its burden supporting application of the violent-threat and obstruction-of-justice enhancements, *see* U.S.S.G. § 2D1.1(b)(2) and (16)(D), reasoning the hearsay evidence introduced by the government was not sufficiently reliable to establish Stamps tried to put a hit out on a potential witness to her then-charged crimes. *See ante*, at 15–21. I disagree.

The district court relied on the statements of a confidential source that were summarized in two reports by law enforcement officers after interviews with the source. According to these reports, the confidential source claimed Stamps took steps to communicate the identity of an undercover officer to individuals who could coordinate killing the officer. The source's assertion of the steps Stamps had taken to accomplish her objective were partially corroborated by transcripts of Stamps's jail house calls. This corroboration gave the confidential source's claims an indicia of reliability sufficient for the district court to rely on them for purposes of sentencing. *See United States v. Dominguez*, 834 F. App'x 300, 301 (8th Cir. 2021)

(unpublished per curiam) (affirming an enhancement based on corroborated double hearsay); *United States v. Ngombwa*, 893 F.3d 546, 557 (8th Cir. 2018) ("When hearsay used at sentencing is corroborated, we have traditionally found such evidence to be sufficiently reliable."); *United States v. Garcia*, 774 F.3d 472, 475 (8th Cir. 2014) (explaining a district court "may consider uncorroborated hearsay evidence [at sentencing] so long as the evidence has sufficient indicia of reliability to support its accuracy and the defendant is given a chance to rebut or explain it"); *United States v. Sheridan*, 859 F.3d 579, 583 (8th Cir. 2017) (explaining a district court may rely on uncorroborated hearsay if the defendant has the opportunity to respond to it and recognizing the district court has considerable discretion when determining the reliability of such information). Considering this evidence, I would conclude the district court did not clearly err in finding by a preponderance of evidence that Stamps "directed the use of violence," U.S.S.G. § 2D1.1(b)(2), and "obstructed justice in connection with the investigation or prosecution of the offense," U.S.S.G. § 2D1.1(b)(16)(D).[12]

Turning to Campos and Watson, I disagree with the court's conclusion that they are not career offenders for purposes of the Guidelines. *See ante*, at 4–14. According to the court, the appellants' past drug convictions under section 481.112(a) of the Texas Health and Safety Code do not qualify as "controlled substance offenses" because the Texas statute of offense criminalizes a mere "offer to sell," making it categorically broader than the definition in the Guidelines. *See*

---

[12]As an alternative rationale, the court concludes the district court also erred in applying the obstruction-of-justice enhancement because, "[a]t most, the sentencing record suggests Stamps *attempted* to intimidate the undercover officer or to otherwise obstruct justice." *Ante*, at 20–21 n.12. According to the majority, this enhancement does not apply to mere attempts to intimidate or obstruct justice. *Id.* But I see no precedent interpreting § 2D1.1(b)(16)(D) so narrowly. Regardless, if the district court had explored such an argument, it would seem a two-level upward adjustment for attempted obstruction under § 3C1.1 would likely apply if § 2D1.1(b)(16)(D) did not. *See* U.S.S.G. § 3C1.1, cmt. (n.7) (explaining, "if the defendant receives an enhancement under § 2D1.1(b)(16)(D), do not apply this adjustment").

U.S.S.G. § 4B1.2(b) (defining a "controlled substance offense" in relevant part as any state offense "punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance)"). Although this is admittedly a close call, the Texas statute fits within our interpretation of § 4B1.2(b).

Under our controlling precedent, a controlled substance offense for purposes of the Guidelines includes inchoate offenses such as attempted distribution of a controlled substance. *See United States v. Henderson*, 11 F.4th 713, 717 (8th Cir. 2021) (holding our precedent dictates that "inchoate offenses are § 4B1.2(b) controlled substance offenses"). And we have repeatedly held that state crimes for which conviction may occur based on "delivery" of an illegal drug qualify as controlled substance offenses for purposes of § 4B1.2. *See United States v. Jefferson*, 975 F.3d 700, 707 (8th Cir. 2020) (holding a Wisconsin statute including "deliver" in its offense conduct qualified as a controlled substance offense); *United States v. Thomas*, 886 F.3d 1274, 1275 (8th Cir. 2018) (holding a Missouri statute including "deliver" in its offense conduct qualified as a controlled substance offense); *United States v. Maldonado*, 864 F.3d 893, 900 (8th Cir. 2017) (holding Nebraska and Iowa statutes that include delivery of drugs categorically qualified as controlled substance offenses).

I recognize that the court in these cases distinguished the state laws at issue from this same Texas statute on the understanding that Texas law allowed for the possibility of conviction under this statute for a "mere offer to sell," without something more to show intent to actually deliver a controlled substance. *See Jefferson*, 975 F.3d at 707; *Thomas*, 886 F.3d at 1276; *Maldonado*, 864 F.3d at 899. But as the Fifth Circuit recently explained, "Texas appellate courts consistently conclude that, if a person offers to sell, 'with no intent to sell narcotics,' but instead the intent 'to defraud [the] buyer of his money,' that conduct 'is not a delivery of controlled substance by offer to sell.'" *Ochoa-Salgado v. Garland*, 5 F.4th 615, 620–21 (5th Cir. 2021) (quoting *Garber v. State*, 671 S.W.2d 94, 99 (Tex. App. 1984)). "Thus, under Texas law, § 481.112 requires an intent to sell" a controlled

substance. *Id.* at 621; *accord United States v. Clark*, 49 F.4th 889, 893 (5th Cir. 2022) (citing this reasoning from *Ochoa-Salgado* to conclude a violation of Texas Health and Safety Code § 481.112 is a predicate offense for purposes of the Armed Career Criminal Act). Following the Fifth Circuit's characterization of Texas law, the convictions at issue here qualify as controlled substance offenses under our precedent. Thus, in this circuit both Campos and Watson are career offenders for purposes of the Guidelines.

As for Watson, there is an additional reason to reject an argument that his Texas conviction does not qualify as a controlled substance offense—he never made it. Not to the district court nor to us.[13] As a result, the plain error standard should then govern our review. *See, e.g.*, *United States v. Williams*, 30 F. 4th 796, 799 (8th Cir. 2022). Considering our precedent as discussed above, one can hardly characterize any possible error as plain. *See United States v. Olano*, 507 U.S. 725, 734 (1993) ("At a minimum, court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law."); *United States v. Jordan*, 877 F.3d 391, 396 (8th Cir. 2017) ("[G]iven the lack of authority on this issue in this circuit and a split in authority in other circuits, even if there were error, it would not be plain or obvious."); *United States v. Lovelace*, 565 F.3d 1080, 1092 (8th Cir. 2009) ("A plain error is one that is clear or obvious under current law."). Nor in my view are the other factors necessary for plain error reversal of a sentence present. *See United States v. Williams*, 910 F.3d 1084, 1094–95 (8th Cir. 2018) (explaining a defendant seeking reversal of a sentence under plain error review must show that, but for the plain error, there was a reasonable probability of a more favorable

---

[13]Watson's failure to raise the issue on appeal would typically settle the matter as we generally "will not address an issue the parties have not argued or one the Supreme Court has not clearly mandated we answer." *United States v. Hutchinson*, 27 F.4th 1323, 1328 (8th Cir. 2022). While the court certainly has the power to sua sponte correct an error not raised by the parties, it should do so only in "exceptional circumstances," *United States v. Atkinson*, 297 U.S. 157, 160 (1936), a standard which I do not believe is satisfied in this case.

sentence, and that the error seriously affects the fairness, integrity, or public reputation of the proceedings).

_____